# Richmond

## WILLIAM STEPHENSON BOYD v. COMMONWEALTH OF VIRGINIA.

June 13, 1975.

Record No. 740853.

Present, All the Justices.

C. Thomas Burton, Jr. (Kenneth E. Trabue; Hunter, Fox & Trabue, on brief), for plaintiff in error.

A. R. Woodroof, Assistant Attorney General (Andrew P. Miller, Attorney General, on brief), for defendant in error.

Per Curiam.

We consider, in this misdemeanor appeal, the validity of an executive order dated November 26, 1973, which provided that, because of a shortage of motor vehicle fuel, the maximum speed limit for

motor vehicles on any highway in the Commonwealth shall not exceed 55 miles per hour.[1]

William Stephenson Boyd appeals a conviction of speeding, which resulted in a fine of $15.00. The offense occurred on January 30, 1974, on Interstate Highway Route 81 in Smyth County. The summons charged the defendant with travelling 70 miles per hour in a "55 zone" in violation of Code § 46.1-193.[2]

The defendant admits that he was driving at a speed of 70 miles per hour at the time and place in question and that appropriate highway signs had been posted near the scene of the offense showing a maximum speed limit of 55 miles per hour. He contends, however, that the conviction was erroneous because the speed limit, established by legislative enactment, had not been lawfully changed by this executive order. He argues that the Governor did not possess the power on November 26, 1973, to declare a State disaster to exist because of a shortage of motor vehicle fuel. We disagree and affirm.

The Governor acted during an acute fuel shortage[3] pursuant to the

---

[1] The executive order of former Governor Holton provided in pertinent part:

"EXECUTIVE ORDER NUMBER THIRTY-SIX

I. "By virtue of the authority vested in me by Section 44-146.17(7) of the Code of Virginia (1950), as amended, I declare a state disaster to exist because of the shortage of motor vehicle fuel. I hereby direct that the maximum speed limit for motor vehicles on any highway, as defined in Section 46.1-1(10), Code of Virginia (1950), as amended, shall not exceed fifty-five miles per hour. The State Highway Commissioner and other authorities having jurisdiction over the highways of this state are hereby directed to post appropriate signs commensurate with this order.

"It is hereby declared that this order shall have the force and effect of law and any violation of the speed limit established herein shall be unlawful and constitute a misdemeanor, punishable as prescribed in Section 46.1-16, Code of Virginia (1950), as amended."

[2] On the date of the offense, Code § 46.1-193 provided, in part, as follows:

"§ 46.1-193. Maximum and minimum speed limits.—The maximum and minimum speed limits on highways of this State shall be as hereinafter prescribed.

(1) Maximum limits.

(a) Seventy miles per hour on the Interstate System of Highways . . . ."

[3] The reasons for the Governor's action were set forth in the following proclamation accompanying the executive order:

"PROCLAMATION BY THE GOVERNOR OF VIRGINIA

Emergency Proclamation

"Within the last six months, shortages in the supply of motor vehicle fuel in the nation and in the state have occurred which shortages have been officially recognized by the President of the United States.

"These shortages of motor vehicle fuel have been so acute that the President of the United States has sought means whereby the supply available may be more

provisions of the "Commonwealth of Virginia Emergency Services and Disaster Law of 1973." Acts 1973, c. 260.

This legislation (hereinafter The Act) was codified in Chapter 3.2 of Title 44 of the Code (Cum. Supp. 1973). The portions pertinent to this litigation stated certain findings of the General Assembly,[4] established certain definitions,[5] and gave certain powers to the Gov-

efficiently used which involves, among other things, reducing the maximum speed limit upon the highways of the nation.

"Among the information that has come to my attention, I note that the Bureau of Public Roads, Federal Highway Administration, has conducted tests to determine the maximum speed of motor vehicles at which the consumption of motor vehicle fuel is the least. Such experiments and tests have disclosed that speed to be fifty-five miles per hour.

"The health, safety, economy and welfare of the citizens of the Commonwealth at large require that immediate action be taken to reduce the maximum speed limit for all motor vehicles using all highways of this state to fifty-five miles per hour in order to conserve the limited supply of motor vehicle fuel and to minimize the impact of present shortages of such fuel.

"Now, therefore, I, Linwood Holton, Governor of the Commonwealth of Virginia, do hereby proclaim an emergency to exist within the Commonwealth and direct that the maximum speed limit for all motor vehicles be reduced to fifty-five miles per hour."

[4] "§ 44-146.14. Findings of General Assembly.—(a) Because of the ever present possibility of the occurrence of disasters of unprecedented size and destructiveness resulting from enemy attack, sabotage or other hostile action, or from fire, flood, earthquake, or other natural causes, and in order to insure that preparations of the State and its political subdivisions will be adequate to deal with such emergencies, and generally to provide for the common defense and to protect the public peace, health, and safety, and to preserve the lives and property of the people of the State, it is hereby found and declared to be necessary:

\* \* \*

"(2) To confer upon the Governor and upon the executive heads or governing bodies of the political subdivisions of the State the emergency powers provided herein;..."

[5] "§ 44-146.16. Definitions.—As used in this chapter unless the context requires a different meaning:

"(1) 'Natural disaster' means any hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, earthquake, drought, fire or other catastrophe resulting in damage, hardship, suffering or possible loss of life;

"(2) 'Man-made disaster' means any condition following an attack by any enemy or foreign nation upon the United States resulting in substantial damage of property or injury to persons in the United States and may be by use of bombs, missiles, shell fire, atomic, radiological, chemical or biological means or other weapons or processes; also the condition resulting from causes such as oil spills, other injurious environmental contamination, conflagrations, explosions, sabotage, covert and overt paramilitary actions, or other similar acts;

\* \* \*

"(5) 'State disaster' means any natural or man-made disaster in any part of the State, which, in the determination of the Governor is, or thereafter determined to be, of sufficient severity and magnitude to warrant disaster assistance by the State to supplement the efforts and available resources of the several localities, and relief

ernor.[6] Among the powers conferred was the authority to declare a State disaster to exist whenever, *in the Governor's opinion*, the safety and welfare of the people of the State requires the exercise of emergency measures.

The crux of the defendant's argument is that a motor vehicle fuel shortage was not such a "disaster" as was contemplated by The Act, and, therefore, the Governor's action was beyond the scope of the powers delegated to him in The Act. We reject this contention.

Our examination of the language of The Act convinces us that the Governor acted within the limits of the authority delegated to him. It is elementary that the health, safety and welfare of the people of this Commonwealth depend upon an adequate supply of motor vehicle fuel. The fuel shortages which developed in 1973 created a potentially serious situation in Virginia, and nationwide. Curtailment of the vital services performed by use of fire, police and other emergency vehicles is but one example of the grave effect a prolonged motor vehicle fuel shortage would have upon the State. Such a situation would have resulted "in damage, hardship, suffering or possible loss of life." Code § 44-146.16(1), note 5 *supra*. Prompt action was required. Manifestly, the "safety and welfare of the people of the State require[d] the exercise of emergency measures." Code § 44-146.17(7), note 6 *supra*. We, therefore, hold that the acute motor vehicle fuel shortage of 1973 was a "disaster" within the meaning of The Act.

---

organizations in alleviating the damage, loss, hardship, or suffering caused thereby and is so declared by him; when it is evident that the resources of the State are adequate to cope with such disasters."

[6] "§ 44-146.17. **Powers and duties of Governor.**—The Governor shall be Director of Emergency Services. He shall take such action from time to time as is necessary for the adequate promotion and coordination of State and local civilian activities relating to the safety and welfare of the State in time of natural or man-made disasters.

"The Governor shall have, in addition to his powers hereinafter or elsewhere prescribed by law, the following powers and duties:

"(1) To proclaim and publish such rules and regulations and to issue such orders as may, in his judgment, be necessary to accomplish the purposes of this chapter. Executive orders shall have the force and effect of law and the violation thereof shall be punishable as a misdemeanor in every case where the executive order declares that its violation shall have such force and effect;

\* \* \*

"(7) Whenever, in the opinion of the Governor, the safety and welfare of the people of the State requires the exercise of emergency measures he may declare a State disaster to exist;"

■ The defendant attempts to buttress his argument that an acute energy shortage was beyond the scope of the 1973 Act by pointing to subsequent amendments to the legislation. After the commission of the offense giving rise to the conviction in this case, the 1974 General Assembly amended The Act[7] by adding new provisions. For example, within the "findings" section, it was declared that preservation of "the economic well-being" of the people of the State was a purpose of The Act.[8] A "resources shortage" was included among the "disasters" listed in The Act.[9] The defendant contends that by making these amendments, the legislature intended to change the law in force at the time of this offense, which, he says, had not previously recognized the shortage of fuel as one of the "disasters" defined in The Act. We do not agree.

It is true, as the defendant argues, that in the field of statutory construction, a presumption normally arises that a change in law was intended when new provisions are added to prior legislation by an amendatory act. *Richmond* v. *Sutherland,* 114 Va. 688, 693, 77 S.E. 470, 472 (1913). But that rule is not controlling here. There were inconsistent decisions in the trial courts of the Commonwealth, on the issue presented in this case, under the 1973 Act, according to a representation in the defendant's brief. The amendments, by emergency legislation, followed passage of the 1973 Act within a year. Accordingly, we hold that the amendments to The Act pertinent to this litigation were changes of form, which merely interpreted the 1973 Act and made it more detailed and specific. They were not changes of substance, which add rights to, or withdraw existing rights from, an original act. *See* 1A *Sutherland Statutory Construction* § 22.30 at 179 (4th ed. C. Sands 1972). When amendments are enacted soon after controversies arise "as to the interpretation of the original act, it is logical to regard the amendment as a legislative

---

[7] These amendments, Acts 1974, c. 4, became effective February 15, 1974, by emergency legislation.

[8] Code § 44-146.14 (Cum. Supp. 1974).

[9] Code § 44-146.16(2) (Cum. Supp. 1974). "Resource shortage" was defined as "the absence, unavailability or reduced supply of any raw or processed natural resource, or any commodities, goods or services of any kind which bear a substantial relationship to the health, safety, welfare and economic well-being of the citizens of the Commonwealth." *Id.* (10).

interpretation of the original act—a formal change—rebutting the presumption of substantial change." *Id.* § 22.31 at 184.

For these reasons, the judgment of conviction is

*Affirmed.*