Present:  Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ.

LUCRETIA PUTNAM COPELAND

v.  Record No. 100929    OPINION BY JUSTICE DONALD W. LEMONS
                                    September 16, 2011

LESLIE TODD

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether the Court of Appeals erred when it reversed the judgment of the Circuit Court of Rockingham County and dismissed the petition for adoption filed by Lucretia Putnam Copeland ("Copeland").

I.  Facts and Proceedings Below

On April 11, 2003, Leslie Renee Todd ("Todd") gave birth to a female child who is the subject of this petition for adoption. At the time, Todd was incarcerated at Rockingham County Regional Jail for felony shoplifting and contempt of court.  The name of the child's father does not appear on the birth certificate, and his identity is unknown.  Todd's relatives were not prepared to take her newborn baby, and Todd agreed that Linda Guenther ("Guenther"), who worked as a minister to inmates at the jail, and Guenther's friend, Copeland, would take temporary custody of the child until Todd was released from incarceration.

On July 21, 2003, the Rockingham County Juvenile and Domestic Relations District Court (the "J&DR court") entered an order granting Guenther and Copeland "legal and physical custody, subject to [Todd's] visitation at the discretion of

. . . Guenther and . . . Copeland." Guenther and Copeland took the baby to visit Todd while she was incarcerated, usually on a weekly basis. Although Guenther and Copeland both cared for the baby during the first year, Copeland eventually became the baby's primary physical custodian.

After Todd was released in September 2003, Copeland, Guenther, and Todd all agreed that Todd could not take care of the child due to her housing and financial situation. However, both Guenther and Copeland encouraged Todd to spend time with the child, and they facilitated visits by providing transportation for Todd. Todd saw the child frequently through April 2005. During this period, the child lived exclusively with Copeland. Todd never offered financial support nor asked that the child be returned to her.

Beginning in April 2005, Todd's contact with the child began to wane. Between that time and June 2006, Todd only had contact with the child three times through two telephone calls and one chance encounter at a department store parking lot. Between July 2006 and July 2007, Todd neither contacted nor visited the child.

On June 21, 2007, Copeland met Todd at a local church and asked Todd for her consent to adopt the child. At that meeting, Todd refused Copeland's request, and she asked to see the child.

Copeland agreed, and Todd visited with the child for approximately thirty minutes at Copeland's home.

After that visit, Todd asked that she be allowed to visit the child more frequently. However, Copeland, upon the advice of an attorney, refused further visitation. In response, Todd sought and received court-ordered visitation with the child from the J&DR court. The J&DR court appointed the Center for Marriage and Family Counseling (the "CMFC"), a private, non-profit counseling agency, to help set up a visitation plan for Todd and the child.

On November 26, 2007, Copeland filed a petition in the circuit court to adopt the child "without the consent of [Todd] pursuant to [Code §] 63.2-1202(H)." In January 2008, Todd completed orientation with the CMFC and began supervised visits with the child. Todd visited the child on every occasion allowed by the court order. Counselors at the CMFC monitored these visits and reported that Todd and the child "interact[ed] in a positive manner," and that "Todd has the knowledge, skills and ability to maintain and nurture an appropriate relationship with [the child]." Throughout these visits, the child was unaware that Todd was her birth mother. In a report dated March 20, 2008, the CMFC recommended that "Todd have the opportunity to have unrestricted visits with [the child] at her home and without Ms. Copeland's presence." The CMFC further opined that

3

"[f]rom a developmental perspective, it would be detrimental . . . to terminate a mother/daughter relationship at this point." On April 24, 2008, the J&DR court issued an order mandating continued weekly visitations between Todd and the child at the CMFC, and ordered that "[d]isclosure of identity of birth mother shall not occur [with]out the consent of present custodians and birth mother."

At the hearing regarding Copeland's petition for adoption, the circuit court heard testimony from several witnesses, including Guenther, Copeland, and Todd. Todd testified that she was not seeking immediate custody and that "[her] goal is not to take [the child] from [Copeland]." Todd testified that Copeland has "done a phenomenal job raising [the child]" and stated that it would probably be "traumatic" to move the child from Copeland's home. However, Todd stated that she does "eventually" want custody, but that "right now [her] plan is not to rip [the child] from [Copeland]."

At the conclusion of the proceedings, the circuit court granted Copeland's petition for adoption, holding that Todd failed to maintain contact with the child for a period of six months prior to the filing of the petition as provided in Code § 63.2-1202(H) and, in the alternative, that Todd had withheld her consent contrary to the child's best interests as provided in Code §§ 63.2-1203 and -1205.

4

Code § 63.2-1202(H) states that an adoption may proceed without a birth parent's consent when the prospective adoptive parent proves by clear and convincing evidence that the biological parent "without just cause, has neither visited nor contacted the child for a period of six months prior to the filing of the petition for adoption."  In interpreting this six month time period, the circuit court stated that Todd's contact with the child on June 21, 2007 "is solely, effectively the result of [Copeland] approaching her on the issue of adoption," and "the evidence shows that if [Copeland] hadn't instituted these adoption conversations this status quo could have continued for years."  Therefore, the circuit court held "that as a matter of fact that [Copeland] has established by clear and convincing evidence that [Todd] . . . without just cause has neither visited nor contacted this child for a period of six months prior to the filing of the petition for adoption," with "[t]he said six month period being contained in the period of June 10th, 2006, until June the 20th, 2007."  Accordingly, the circuit court held that under Code § 63.2-1202(H), Todd's consent to the adoption "is not necessary."  Alternatively, if the six month period of abandonment was not met under Code § 63.2-1202(H), the circuit court held that Todd withheld her consent for the adoption contrary to the child's best interests under Code §§ 63.2-1203 and -1205.

Code § 63.2-1203 states that if,

> after consideration of the evidence, the circuit court finds that the valid consent of any person or agency whose consent is required is withheld contrary to the best interests of the child as set forth in Code § 63.2-1205, or is unobtainable, the circuit court may grant the petition without such consent.

When "determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child," a circuit court

> shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

Code § 63.2-1205.

In support of its determination that Todd withheld her consent contrary to the child's best interests, the circuit court addressed each of the eight factors set forth in Code § 63.2-1205. The circuit court held that: (1) Todd's efforts to obtain legal and physical custody of the child were "minimal and after the first two years almost nonexistent;" (2) Todd was not able financially or otherwise to assume full custody; (3) there

6

was no effort by any other individuals to thwart Todd's assertion of parental rights; (4) Todd was not able to care for the child because of "her financial situation, her financial dependence[, and] her inability to legally operate a motor vehicle even five years post-release from incarceration;" (5) the child, at the age of five, has only known her home to be with Copeland and needs finality in a stable home life; (6) Todd's relationship with the child was poor, as she "in effect abandoned this child" and "simply failed to assume her duties as a parent" upon her release from jail; (7) the child's present custodial home with Copeland is "safe and secure from a duration standpoint it covers almost all of the child's life;" and (8) considering the long periods of abandonment by Todd, a change of physical custody from Copeland to Todd would "expose[] this child to substantial risk."  Accordingly, the circuit court held that, "considering the factors set forth in [Code § 63.2-1205, Todd's] consent is withheld contrary to the best interest of the child."

A three-judge panel of the Court of Appeals reversed the circuit court and held that "the Fourteenth Amendment to the United States Constitution requires prospective adoptive parents to prove, by clear and convincing evidence, both that the entry of an adoption order over the objection of a nonconsenting parent is in the best interest of the child and that a

7

continuing relationship with the birth parent would be detrimental to the child's welfare." Todd v. Copeland, 55 Va. App. 773, 778, 689 S.E.2d 784, 787 (2010) (emphasis in original).

The panel held that "the detriment to the child standard exists independent of the Virginia Code to protect the parental rights of biological parents – rights that the United States Supreme Court has recognized are protected by the Fourteenth Amendment to the United States Constitution." Id. at 789, 689 S.E.2d at 792. Therefore, "a trial court must make a detriment to the child determination, regardless of the language of the relevant statute, before entering an adoption order, in order to protect the Fourteenth Amendment rights of a nonconsenting biological parent." Id. at 790, 689 S.E.2d at 792. Additionally, after finding that the General Assembly did not intend to abandon the "detriment to the child standard" through its 2006 amendment to Code § 63.2-1205, the panel concluded that the circuit court erred in granting Copeland's petition for adoption because it did not consider whether a continuing relationship between Todd and the child would be detrimental to the child's welfare. Id. at 792, 689 S.E.2d at 793. Additionally, the Court of Appeals panel determined that the trial court erred in its interpretation of Code § 63.2-1202 (H) because "the plain language of [the statute] refers to the six

months immediately preceding the filing of the adoption petition."  Id.

Copeland's petition for a rehearing en banc was denied, and she timely filed her notice of appeal to this Court.  We awarded her an appeal on the following assignments of error:

1. The Court of Appeals erred in interpreting Virginia Code § 63.2-1202(H) so that, after the birth mother had abandoned her child for over a year, a single 30-minute visit with the child within six months of the petition for adoption – occurring only because the mother's consent to adoption was sought – was sufficient to defeat the statute's application.

2. The Court of Appeals erred in reading the "detriment to the child" requirement – specifically removed from the statute by the General Assembly – back into the statute in direct contravention of the legislature's intent.

We also granted Todd's two assignments of cross-error:

1. The Court of Appeals erred by declining to consider Todd's claim that Code §§ 63-1203 and 1205 are unconstitutional on equal protection grounds.

2. The Court of Appeals erred by declining to consider whether the sufficiency of the evidence presented at trial proved that [the child's] adoption was in [its] best interest.

II. Analysis

A. Standard of Review

The rules of statutory construction govern our analysis here.  "Principal among these rules is that we determine, and adhere to, the intent of the legislature reflected in or by the statute being construed."  Virginia Soc'y for Human Life v.

9

<u>Caldwell</u>, 256 Va. 151, 156, 500 S.E.2d 814, 816 (1998)(citation omitted).

> Where the words used in the statute are not sufficiently explicit, we may determine the intent of the legislature "from the occasion and necessity of the statute being passed [or amended]; from a comparison of its several parts and of other acts <u>in pari materia</u>; and sometimes from extraneous circumstances which may throw light on the subject."

<u>Id.</u> (quoting <u>Richmond v. Sutherland</u>, 114 Va. 688, 691, 77 S.E. 470, 471 (1913)).

Additionally, "constitutional arguments are questions of law that [this Court reviews] de novo." <u>Shivaee v. Commonwealth</u>, 270 Va. 112, 119, 613 S.E.2d 570, 574 (2005). "[W]hen, as here, the constitutionality of a statute is challenged, our determination of legislative intent is guided by the recognition that 'all actions of the General Assembly are presumed to be constitutional.' " <u>Caldwell</u>, 256 Va. at 157, 500 S.E.2d at 816-17 (1998) (quoting <u>Hess v. Snyder Hunt Corp.</u>, 240 Va. 49, 52, 392 S.E.2d 817, 820 (1990)). Although "a presumption normally arises that a change in law was intended when new provisions are added to prior legislation by an amendatory act" or "existing rights" are "withdraw[n] from [an] act," <u>Boyd v. Commonwealth</u>, 216 Va. 16, 20, 215 S.E.2d 915, 918 (1975), we have a duty to construe statutes subject to a constitutional challenge in a manner that "avoid[s] any conflict

10

with the Constitution." Commonwealth v. Doe, 278 Va. 223, 229, 682 S.E.2d 906, 908 (2009) (citations omitted).

B. Birth Parent Consent under Code § 63.2-1202(H)

Code § 63.2-1202(H) states that an adoption may proceed without a birth parent's consent when the prospective adoptive parent proves by clear and convincing evidence that the biological parent has failed, without just cause, to visit or contact the child "for a period of six months prior to the filing of the petition for adoption." Here, Todd visited the child on June 21, 2007, within the six month period prior to Copeland's petition for adoption filed on November 26, 2007.

In support of its holding that Todd's consent to the adoption was not necessary under Code § 63.2-1202(H), the circuit court stated that "it would be an unreasonable interpretation of that statute to find that the mere fact that the potential adoptive mother had the decency to call [Todd] somehow or another undo[es] or cancel[s] out the abandonment." Accordingly, the circuit court held that the applicable six month period for purposes of Code § 63.2-1202(H) was "the period of June 10th, 2006, until June the 20th, 2007," and because Todd did not contact or visit the child during this period, her consent was not required to grant Copeland's petition for adoption.

11

The Court of Appeals did not err in reversing this ruling of the circuit court. The Court of Appeals held that the phrase "prior to" in Code § 63.2-1202(H) "refers to the six months immediately preceding the filing of the adoption petition." Todd, 55 Va. App. at 792-93, 689 S.E.2d at 794. "The phrase 'prior to' may be clumsy, but its meaning is clear." United States v. Locke, 471 U.S. 84, 95 (1985) (holding that a statutory deadline of "prior to December 31" to mean "on or before December 30," the date immediately preceding the date certain).

Copeland urges this Court to interpret Code § 63.2-1202(H) to require meaningful or significant visitation or contact to satisfy the terms of the statute. However, this interpretation goes beyond the plain meaning of the statute and would require courts to evaluate the quality and value of time spent between a birth parent and child. We refuse to adopt such an interpretation. See, e.g., Evans v. Evans, 280 Va. 76, 82, 695 S.E.2d 173, 176 (2010) (courts are bound by the plain meaning of language appearing in unambiguous statutes); Gilliam v. McGrady, 279 Va. 703, 709, 691 S.E.2d 797, 800 (2010) ("It is not the function of the courts to add to or to amend clear statutory language.").

C. The "Best Interests of the Child" in Adoption Cases

12

Alternatively, the circuit court granted Copeland's petition for adoption under Code § 63.2-1205 because Todd withheld her consent "contrary to the best interest of the child." Although the Code of Virginia has long provided a procedure by which a court may enter an adoption order in the absence of the birth parents' consent, we consistently have interpreted those statutes to balance the best interests of the child in question and the Fourteenth Amendment rights of the biological parents.

Before 1995, the applicable adoption statute governing the parental consent requirement for adoptions provided in pertinent part that: "If after hearing evidence the court finds that the valid consent of any person or agency whose consent is hereinabove required is withheld contrary to the best interests of the child . . . the court may grant the petition without such consent." Former Code § 63.1-225(E) (Supp. 1994). However, this statute lacked a standard to determine when consent is withheld contrary to the best interests of the child.

In the absence of such a standard, we developed the "detriment to the child" standard in order to balance the child's best interests with the constitutional rights of the biological parents. In <u>Malpass v. Morgan</u>, 213 Va. 393, 397-99, 192 S.E.2d 794, 797-98 (1972), we held that to conclude that a birth parent's consent is withheld contrary to the best

interests of the child, it is insufficient simply to prove that the best interests of the child would be promoted by the adoption. If this were the case, the consent requirement would be rendered meaningless, and "the effect would have been to permit a court to dispense with consent in all cases in which it found that adoption would promote the best interests of the child." Id. at 398, 192 S.E.2d at 798. Therefore, we held that to hold that a birth parent's consent is being withheld contrary to the best interests of the child, "it must be shown that continuance of the relationship between the [birth parent and child] would be detrimental to the child's welfare." Id. at 399, 192 S.E.2d at 798 (emphasis added).

In 1995, the General Assembly codified the detriment to the child standard when it enacted former Code § 63.1-225.1. See 1995 Acts chs. 772, 826. From 1995 to 2006, that statute and its successors required courts to consider not only the child's best interests, but also whether the continuing relationship between the biological parent and the child would be "detrimental to the child":

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, or is unobtainable, the court shall consider whether the failure to grant the petition for adoption would be detrimental to the child. In determining whether the failure to grant the petition would be detrimental to the child, the court shall consider all relevant factors,

14

> including the birth parent(s)' efforts to obtain
> or maintain legal and physical custody of the
> child, whether the birth parent(s)' efforts to
> assert parental rights were thwarted by other
> people, the birth parent(s)' ability to care for
> the child, the age of the child, the quality of
> any previous relationship between the birth
> parent(s) and the child and between the birth
> parent(s) and any other minor children, the
> duration and suitability of the child's present
> custodial environment and the effect of a change
> of physical custody on the child.

Id. (emphasis added).[*]

Most recently, after establishing a joint subcommittee to study Virginia's adoption laws, see S.J. Res. 331, Va. Gen. Assem. (Reg. Sess. 2005), the General Assembly amended Code § 63.2-1205 to remove the language requiring a finding of detriment to the child to permit adoption without parental consent. See 2006 Acts chs. 825, 848 (effective July 1, 2006). As applicable to the present proceedings, this statute focuses on the "best interests of the child," stating:

> In determining whether the valid consent of
> any person whose consent is required is withheld
> contrary to the best interests of the child, or
> is unobtainable, the circuit court . . . shall
> consider whether granting the petition pending
> before it would be in the best interest of the
> child. The circuit court . . . shall consider
> all relevant factors, including the birth
> parent(s)' efforts to obtain or maintain legal
> and physical custody of the child; whether the

---

[*] In 2000, the General Assembly repealed former Code § 63.1-225.1 and recodified it as former Code § 63.1-219.13. See 2000 Acts ch. 830. Then, in 2002, the General Assembly repealed former Code § 63.1-219.13 and recodified it as Code § 63.2-1205. See 2002 Acts ch. 747.

birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

Id. (emphasis added).

Therefore, although the General Assembly retained the factors previously required to determine whether the failure to grant the petition for adoption would be detrimental to the child, they are now factors relevant to determining whether consent is withheld contrary to the "best interests" of the child." Id.

D. The Constitutionality of Code § 63.2-1205

Copeland assigns error to the Court of Appeals' holding that "the trial court's application of Code §§ 63.2-1203 and -1205 violated Todd's due process rights because it failed to make the necessary finding under Virginia law that a continuing relationship with her child would be detrimental to the child's welfare." Todd, 55 Va. App. at 796, 689 S.E.2d at 795. Additionally, Todd's assignment of cross-error requires us to consider whether the same statutes violate her Equal Protection rights. Therefore, we must determine whether, after the 2006

16

amendments, Virginia's adoption statutes pass constitutional muster.

## 1. Due Process

The phrase "best interests of the child" is most commonly used in the context of custody disputes between natural parents. Code § 20-124.2(B) provides that "[i]n determining custody, the court shall give primary consideration to the best interests of the child," and Code § 20-124.3 delineates ten factors to be weighed in assessing the best interests of children in custody and visitation matters. In this context, a court weighs these factors to determine what custody or visitation arrangement would best promote the child's interests. In these cases, "the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute." Bailes v. Sours, 231 Va. 96, 99, 340 S.E.2d 824, 826 (1986) (quoting Walker v. Brooks, 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962)).

However, the meaning of "the best interests of the child" is different in the context of adoptions, and must be read in light of the biological parent's due process rights in her relationship to her child. Therefore, although Code § 63.2-1205 uses the same phrase as our custody statutes, its definition is much more demanding.

We consistently have held that to grant a petition for adoption over a birth parent's objection, there must be more than a mere finding that the adoption would promote the child's best interests.  Malpass, 213 Va. at 398-99, 192 S.E.2d at 798-99.  Our rationale is clear: if a mere finding of promotion is all that is required to determine that the birth parent's consent is withheld contrary to the child's best interests, a court effectively could divest a natural parent of all rights and obligations with respect to the child simply by finding that placement in the prospective adoptive home is more suitable to the child than placement with the birth parent.  Id. at 398, 192 S.E.2d at 798.  We further have explained:

> While in both adoption and custody cases the primary consideration is the welfare and best interest of the child, it does not necessarily follow that the natural bond between parent and child should be ignored or lightly severed. On the contrary, this bond should be accorded great weight. We should apply neither the fitness test nor the best interest test to the exclusion of the other. We must determine whether the consequences of harm to the child of allowing the parent-child relationship to continue are more severe than the consequences of its termination.

Doe v. Doe, 222 Va. 736, 747, 284 S.E.2d 799, 805 (1981).

The United States Supreme Court also has emphasized that the Constitution requires more than a showing of the best interests of the child to terminate parental rights.  The Supreme Court has explicitly recognized that the relationship

18

between a parent and child is constitutionally protected by the Due Process Clause of the Fourteenth Amendment. Quilloin v. Walcott, 434 U.S. 246, 255 (1978). "The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65 (2000). Therefore, adoption cases invoke significant substantive and procedural safeguards to protect the biological parent's due process rights. See Armstrong v. Manzo, 380 U.S. 545, 550-52 (1965). When, as here, the biological parent protests the adoption, the involuntary termination of her parental rights makes these safeguards all the more critical.

In Quilloin, 434 U.S. at 255, the Supreme Court explained,

[w]e have little doubt that the Due Process Clause would be offended [if] a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.

(Citation and internal quotation marks omitted.) Additionally, the Supreme Court has held that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made." Troxel, 530 U.S. at 67, 72-73 (holding that a Washington state statute

19

authorizing nonparental visitation whenever "visitation may serve the best interest of the child" unconstitutionally infringed on "the fundamental right of parents to make childrearing decisions").

It is clear that the Constitution requires more than a mere showing of the child's best interests to terminate parental rights.  Therefore, the Court of Appeals correctly determined that "there must be more than a mere finding that granting an adoption over the parent's objection would be in the child's best interests."  Todd, 55 Va. App. at 785, 689 S.E.2d at 790.

However, the Court of Appeals misapplied that determination when it held that the circuit court violated Todd's due process rights.  Virginia's statutory scheme for adoption, including Code §§ 63.2-1205 and -1208, defines the best interests of the child in terms that require more expansive analysis than when the contest is between two biological parents.

Inclusion of the precise language of "detriment" is not necessary for these statutes to pass constitutional muster.  The phrase "detriment to the child" is no term of art or requisite mantra.  Rather, for these statutes to pass constitutional due process scrutiny, they must provide for consideration of parental fitness and detriment to the child.  The Virginia statutory scheme does so.

20

The eight factors in Code § 63.2-1205, including "whether the birth parent(s) are currently willing and <u>able</u> to assume full custody of the child" and "the birth parent(s)' <u>ability</u> to care for the child," focus on <u>both</u> the parent and child and therefore compel a court to consider whether a parent's unfitness would be harmful to the child's welfare. (Emphasis added.)  Additionally, Code § 63.2-1208, which sets forth procedures by which a court may order a child-placing agency to conduct an investigation into the adoption and report its findings to the court, also includes considerations that go beyond a mere best interest of the child inquiry.  Code § 63.2-1208(A).  The statute mandates that the investigation include inquiries as to

> (i) whether the petitioner is financially able[,] morally suitable, in satisfactory physical and mental health and a proper person to care for and to train the child; (ii) what the physical and mental condition of the child is; (iii) why the parents, if living, desire to be relieved of the responsibility for the custody, care, and maintenance of the child, and what their attitude is toward the proposed adoption; (iv) <u>whether the parents have abandoned the child or are morally unfit to have custody over him</u>; (v) the circumstances under which the child came to live, and is living, in the physical custody of the petitioner; (vi) whether the child is a suitable child for adoption by the petitioner; (vii) what fees have been paid by the petitioners or on their behalf to persons or agencies that have assisted them in obtaining the child; and (viii) whether the requirements of subsections E and F have been met.

Code § 63.2-1208(D) (emphasis added).  Additionally, the report must include "the relevant physical and mental history of the birth parents."  Code § 63.2-1208(E).  The statutes require a court to consider the parents' ability to care for the child, their potential moral unfitness or abandonment, and any "relevant physical and mental history."  Id.

Therefore, we hold that the Virginia Code's adoption statutes meet constitutional due process scrutiny because they encompass far more than mere consideration of the child's best interests as defined in cases involving a contest between natural parents.  Here, the circuit court explicitly and comprehensively considered each factor enumerated in Code § 63.2-1205.  In conducting this analysis, the court considered Todd's fitness and ability to care for the child, and ultimately concluded that "considering the factors set forth in [Code § 63.2-1205, Todd's] consent is withheld contrary to the best interest of the child."  The court's determination went beyond whether the adoption by Copeland would be in the child's best interest by finding in Todd "some showing of unfitness," Quilloin, 434 U.S. at 255, and implicitly recognizing that "continuance of the relationship between [Todd and the child] would be detrimental to the child's welfare."  Malpass, 213 Va. at 399, 192 S.E.2d at 798.  Therefore, the circuit court gave adequate consideration to Todd's due process rights under the

22

Fourteenth Amendment, and it did not err in granting Copeland's petition for adoption.

## 2. Equal Protection

Todd also challenges the constitutionality of Code §§ 63.2-1203 and -1205 on equal protection grounds. She argues that her equal protection rights were violated "because an adoption initiated by a private party under [Code § 63.2-1205] does not receive the same protections for the child or its natural parents as an adoption initiated by the Virginia Department of Social Services under Code § 16.1-283." We reject Todd's argument.

The Equal Protection Clause of the Fourteenth Amendment forbids any state to deny a person within its jurisdiction the equal protection of the laws. We have held that "[t]his proscription guarantees that classes or persons will be given the same protection as like classes or persons. It does not require similar treatment of persons not similarly situated." Carter v. Carter, 232 Va. 166, 170, 349 S.E.2d 95, 97 (1986).

In this case, Todd is not similarly situated to a parent involved in an adoption under Code § 16.1-283, where children are in the custody of the state and parental rights are in jeopardy of being terminated under Virginia's foster care statutes. Unlike the foster care context, here the government did not remove the child from Todd's custody. Rather, by

23

entering into the entrustment agreement with Guenther and Copeland, Todd voluntarily relinquished custody of the child. Therefore, Todd is not similarly situated to a person whose parental rights are involuntarily terminated by the state under Code § 16.1-283.

### 3. Sufficiency of the Evidence

Finally, Todd maintains that the evidence is insufficient to support the factual findings necessary under the Virginia statutory scheme.  Upon review of the record, we are satisfied that the evidence is sufficient to support the judgment of the circuit court in granting the petition for adoption pursuant to Code §§ 63.2-1200 et seq.

### III. Conclusion

For the reasons stated, we hold that the Court of Appeals did not err in reversing the circuit court's holding that Todd's consent to the adoption was not necessary under Code § 63.2-1202(H).  However, the Court of Appeals erred in its judgment that the circuit court violated Todd's due process rights under Code §§ 63.2-1203 and -1205.  Accordingly, we will affirm the judgment of the Court of Appeals in part and reverse the judgment in part, and reinstate the final decree of adoption entered by the circuit court on March 18, 2009.

Affirmed in part,
reversed in part,
and final judgment.

24