COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Beales and AtLee
Argued at Richmond, Virginia

UNPUBLISHED

TINA LYNN TOLLEY

MEMORANDUM OPINION* BY
v.        Record No. 0913-17-2                JUDGE RICHARD Y. ATLEE, JR.
                                              MARCH 20, 2018
TERRY LOU TOLLEY


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Joseph J. Ellis, Judge

James Joseph Ilijevich for appellant.

Carolyn S. Seklii (Stuart C. Sullivan & Carolyn S. Seklii,
Attorneys at Law, P.L.C.; Matthew J. Yao, Guardian *ad litem* for
the minor child; Woehrle Dahlberg Jones Yao, PLLC, on brief),
for appellee.


Terry Tolley ("Terry") petitioned the Circuit Court of Spotsylvania County for leave to

adopt the biological child ("the child") of Tina Tolley ("mother").[1]  The circuit court found that

mother was withholding her consent to the adoption contrary to the best interests of the child,

and granted Terry's petition.  Mother appealed the circuit court's decision.  We now affirm.

I. BACKGROUND

We view the evidence in the light most favorable to the party that prevailed below, and

draw all reasonable inferences from the evidence in that party's favor.  Boatright v. Wise Cty.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The child's biological father was also part of the adoption proceedings, but his rights are
not at issue in this appeal.

Dep't of Soc. Servs., 64 Va. App. 71, 76, 764 S.E.2d 724, 727 (2014).  Here, Terry prevailed in the circuit court.  The facts were as follows.[2]

The child was born in 2010.  Afterwards, both mother and the child lived with Terry, who is mother's aunt (and thus the child's great-aunt).  Since then, the child has lived at Terry's home continuously.  In 2013, by agreement between mother and Terry, the Spotsylvania County Juvenile and Domestic Relations District Court ("the J&DR court") granted mother and Terry joint legal custody of the child, and granted Terry primary physical custody.

The J&DR court's custody order also stated that mother "is required to begin individual counseling and remain in counseling until released by her counselor.  She is also required to keep regular appointments with her psychiatrist and take all medication as prescribed." (Capitalization altered).  While mother, Terry, and the child were all living together, mother "on occasion, would leave for a week or two at a time to live with friends or boyfriend(s) and would then return to Terry['s] . . . home when it was convenient."  During the course of the custody litigation in 2013, mother's own mother provided a sworn statement that mother had "a mental condition that makes her uncontrollably violent at times," that mother "consistently fails to follow thru with . . . treatment," and that mother had "a problem with the abuse of prescription drugs."

By December 2013, mother's relationship with Terry and the child had deteriorated, and the J&DR court entered an emergency protective order barring mother from having any contact with Terry or the child.  In February 2014, the J&DR court entered a one-year protective order, forbidding any such contact except for a single two-hour supervised visit on the first of March.

---

[2] Unless otherwise indicated, the quotations that follow come from the "Written Statement of Facts" and from the circuit court's letter opinion, dated May 8, 2017.

Later in March, however, an incident occurred at Terry's home:

> [Terry] was in her backyard watching the child and four other children play on a trampoline when [mother] approached [Terry] from behind with a knife and stabbed her in the head. [Terry] turned around and was stabbed again before running into the kitchen where [mother] picked up a coffee pot and continually hit [Terry]. According to [Terry], blood was all over the kitchen. The entire incident occurred in the presence of the child and four other children. The child was then only 3 ½ years old. [Mother] was on pain medication that was not prescribed to her at the time of this incident. [Mother] was arrested and pled guilty to Unlawful Wounding and Assaulting a Person with a Protective Order. On January 22, 2015, [mother] received an active sentence of three years and six months . . . .

(Footnote omitted).[3] After the attack, a psychologist diagnosed the child with post-traumatic stress disorder. After witnessing the knife attack, the resulting blood, and the police response, the child developed a fear of the color red, of knives, and of anyone in uniform. At the time of the hearing on the adoption petition, more than two years after the attack, the child remained in therapy. The child has had no contact with mother since the day of the crime.

Approximately six months after Terry was attacked, the J&DR court granted her sole legal and physical custody of the child. In April 2015, Terry petitioned the circuit court for leave to adopt the child. Mother did not consent. After a protracted period involving numerous continuances, primarily due to the child's father, the circuit court heard the adoption petition in in March 2017. In May 2017, the circuit court entered a "Final Order of Adoption" ("the adoption order"), finding that mother's consent was withheld "contrary to the best interest of the child." Mother then noted this appeal.

## II. ANALYSIS

Mother assigns the following two errors:

1. The [circuit c]ourt erred by finding that . . . mother withheld her consent for adoption of her minor child, against the child's best

---

[3] Mother's scheduled release from the penitentiary is in 2019.

interest, when there was evidence that, prior to her incarceration, mother lived with the child, fostered a relationship with the child, and even shared legal custody of the child with [Terry], in consideration of the best interests of the child, while [mother] struggled with mental health and substance abuse problems.

2. The [circuit] court erred by finding that . . . mother failed to visit her minor child without just cause when her lack of visitation or contact was the result of not only incarceration, but also because of a [p]rotective [o]rder, which included the minor child, obtained by [Terry].

## A. Standard of Review

"A trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). That presumption is rooted in a circuit court's "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. at 328, 387 S.E.2d at 795. A circuit court's decision "based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988). A party seeking to adopt a child over the objection of the child's birth parents must show, by clear and convincing evidence, that the adoption would be in the child's best interests. See Lyle v. Eskridge, 14 Va. App. 874, 876, 419 S.E.2d 863, 865 (1992).

## B. First Assignment of Error

In her first assignment of error, mother asserts that "[t]he [circuit c]ourt erred by finding that . . . mother withheld her consent for adoption of her minor child, against the child's best interest." This was error, she argues, because "there was evidence that, prior to her incarceration, mother lived with the child, fostered a relationship with the child, and even shared legal custody of the child with [Terry], in consideration of the best interests of the child, while [mother] struggled with mental health and substance abuse problems."

- 4 -

> [T]he meaning of "the best interests of the child" is different in the context of adoptions [than it is in the context of custody disputes], and must be read in light of the biological parent's due process rights in her relationship to her child. Therefore, although Code § 63.2-1205 uses the same phrase as our custody statutes, its definition is much more demanding.
>
> We consistently have held that to grant a petition for adoption over a birth parent's objection, there must be more than a mere finding that the adoption would promote the child's best interests.

Copeland v. Todd, 282 Va. 183, 197, 715 S.E.2d 11, 19 (2011). "Virginia's statutory scheme for adoption, including Code §§ 63.2-1205 and -1208, defines the best interests of the child in terms that require more expansive analysis than when the contest is between two biological parents." Id. at 199, 715 S.E.2d at 20. Even applying this "more expansive analysis," we find that the circuit court did not err when it granted the adoption petition.

Consent of the birth parents is ordinarily required before a child may be adopted. See Code § 63.2-1202(A). In certain situations, however, a circuit court can grant an adoption petition notwithstanding the unwillingness of the birth parents to consent to such adoption. Code § 63.2-1203(A). Code § 63.2-1205 states that, "[i]In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, . . . the circuit court . . . shall consider whether granting the petition pending before it would be in the best interest of the child." In such situations, the circuit court

> shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

Id. These factors weigh strongly in favor of the circuit court's determination that mother withheld her consent to the adoption contrary to the best interests of her child.

Regarding mother's "efforts to obtain or maintain legal and physical custody of the child," the circuit court observed that "even from birth there were periods when [mother] was only minimally involved in the child's care" and that "[i]n 2013, [m]other voluntarily relinquished sole legal custody of the child and share[d] legal custody with [Terry]." At the time of the hearing on Terry's adoption petition, mother was unable "to assume full custody of the child," because she still had more than a year and a half of her penitentiary sentence to serve. Mother herself conceded that, once she was finished serving her sentence, she "should not have full custody of [the child] immediately upon her release."

We agree with the circuit court's specific conclusion that "[t]here was no evidence that either [mother]'s or [father]'s efforts to assert parental rights were thwarted by Terry[] or others." As to mother's "ability to care for the child," this was compromised by her history of untreated mental health problems, continuing drug abuse, absence from the home, and violent behavior in the child's presence. The circuit court found that mother's "past behavior suggests that she is unable to sustain an appropriate level of care for [the child] or herself," and we agree that the evidence supports this conclusion. Regarding the "age of child," she was six years old at the time of the hearing, and is now seven. She has never lived anywhere but at Terry's home.

The circuit court assessed "the quality of any previous relationship between the birth parent(s) and the child" in this way:

> Mother's counsel suggests that [m]other had consistent contact
> with the child before she was incarcerated. It is clear to the [c]ourt
> that although [m]other may have spent time with the child, [Terry]
> was then and remains the primary caretaker for the child. When
> [m]other lived with [Terry], [m]other would leave for a week or
> two at a time to live with friends or boyfriend(s) and would return
> when it was convenient.

. . . Mother has struggled with mental health issues her entire life, and as early as 2007 was diagnosed with bipolar disorder with severe psychotic features when she was incarcerated. . . . Mother's failure to comply with her [mental health] medication regiment [sic] would sometimes result in voluntary or involuntary commitment to . . . a behavioral health and substance abuse inpatient program for days at a time.

As to "the duration and suitability of the child's present custodial environment," Terry's home has been the child's home for the child's entire life. The circuit court found that "since the child's birth," Terry had provided her a "safe and stable environment." Finally, regarding "the effect of a change in physical custody on the child," the circuit court found that "it would be extremely detrimental to the child's well-being to sever or diminish [Terry]'s relationship with the child or for the child to . . . reinitiate [a parental relationship] with the [m]other." This conclusion was supported by testimony from the child's counselor that the child "would be 'devastated' if [she] were separated from Terry," and by testimony from the child's psychologist that in his "expert opinion, the best situation for [the child] would be a stable environment where [she] is comfortable with her caretaker and [her] surroundings."

Although "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," Troxel v. Granville, 530 U.S. 57, 65 (2000), in this instance, we agree with the circuit court's conclusion that mother withheld her consent to adoption contrary to the best interest of the child.

### C. Second Assignment of Error

In her second assignment of error, mother asserts that "[t]he [circuit] court erred by finding that . . . mother failed to visit her minor child without just cause when her lack of visitation or contact was the result of not only incarceration, but also because of a [p]rotective [o]rder, which included the minor child, obtained by [Terry]." Code § 63.2-1202(H), states, in part, that "[n]o consent shall be required of a birth parent who, without just cause, has neither

visited nor contacted the child for a period of six months immediately prior to the filing of the petition for adoption."

The trial court, in its letter opinion, discusses mother's failure to visit the child during the time mother was incarcerated. Although the letter opinion addresses this additional ground for granting the adoption petition, the adoption order does not mention mother's failure to visit the child. Instead, the adoption order states "that consent is being withheld contrary to the best interest of the child; and that upon consideration of the statutory factors enumerated in [Code] § 63.2-1205, the [c]ourt finds that the entry of an order of Adoption serves the best interest of the child, and is proper at this time."

Even if we assume that the trial court's letter opinion provided alternative grounds justifying its decision to grant the adoption petition, having affirmed the trial court's conclusion that consent was withheld contrary to the best interests of the child, pursuant to Code § 63.2-1205, we need not address whether mother's failure to visit the child while mother was incarcerated obviated the need for her consent to adoption under Code § 63.2-1202(H). When a trial court renders its judgment on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court. If so, we need not address the other. See Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005).

III. Conclusion

We affirm the circuit court's decision to grant the adoption petition, because mother withheld her consent to the adoption contrary to the best interests of the child.

Affirmed.