COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, Huff and Senior Judge Annunziata

ADRIANNA HALEY SLEDD

v.      Record No. 1228-20-3

ROGER LEE BOWMAN AND
 TINA UNDERWOOD BOWMAN

MEMORANDUM OPINION[*]
PER CURIAM
FEBRUARY 2, 2021

FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
James J. Reynolds, Judge

(C. Holland Perdue, III; Raine & Perdue PLC, on brief), for
appellant.

No brief for appellees.


Adrianna Haley Sledd appeals a final order of adoption.  Sledd argues that the circuit court

erred in "holding that the best interests of the child would be promoted by the adoption."  She

further contends that the circuit court erred by "entering a final order of adoption."  Upon reviewing

the record and briefs of the parties, we conclude that this appeal is without merit.  Accordingly,

we summarily affirm the decision of the circuit court.  See Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

BACKGROUND[1]

"Because the circuit court heard evidence *ore tenus*, its factual findings are 'entitled to the same weight accorded a jury verdict[] and . . . will not be disturbed on appeal unless plainly wrong or without evidence to support' them." Geouge v. Traylor, 68 Va. App. 343, 347 (2017) (quoting Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 44 (2014)). We recite the evidence in the light most favorable to appellees, Roger Lee Bowman and Tina Underwood Bowman, as they prevailed in the circuit court. Id.

Sledd and Nicholas Lewis Jordan are the biological parents to the child who is the subject of this appeal. Sledd was seventeen years old when she gave birth to the child in February 2016. She and the child moved in with the Bowmans, who are the child's paternal grandparents. A few months later, Sledd and Jordan ended their relationship, and Sledd moved out of the Bowmans' residence while the child continued to live with his grandparents. On September 16, 2016, the Franklin County Juvenile and Domestic Relations District Court (the JDR court) awarded joint legal custody of the child to Sledd, Jordan, and Mrs. Bowman. The JDR court awarded physical custody of the child to Mrs. Bowman "with liberal and reasonable visitation to the parents as agreed upon by the parties."

Sledd admitted that thereafter, her "substance abuse really spiraled out of control." In 2017, Sledd overdosed on fentanyl and tested positive for methamphetamines, amphetamines, opiates, and marijuana. Accordingly, on July 31, 2017, the JDR court entered a child protective order against Sledd, and it awarded legal and physical custody of the child to Mrs. Bowman.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

The JDR court further ordered that visitation with the parents shall be at Mrs. Bowman's discretion and visitation "shall not occur while anyone is under the influence of drugs or alcohol."

In 2018, Sledd was arrested for distribution of methamphetamines. Sledd entered into a plea agreement, in which she agreed that the evidence was sufficient to find her guilty of the offense. The plea agreement provided that the court would take the factual finding under advisement and Sledd would be placed on two years of supervised probation. On the same day that Sledd entered into the plea agreement, however, she tested positive for amphetamines, methamphetamines, and MDMA, so her bond was revoked. She subsequently was released on probation, and while on probation, she tested positive for methamphetamines again. Sledd faced a show cause for violating her probation.[2]

On January 23, 2020, the Bowmans filed their petition for adoption of the child.[3] Sledd filed her answer opposing the adoption. The parties appeared before the circuit court on June 30, 2020.

Sledd testified about the Bowmans and their relationship with her and the child. Sledd agreed that the Bowmans had allowed her to visit the child, and they had changed the visitation schedule "multiple times" to accommodate Sledd. Sledd further acknowledged that the child was "doing very well with his development." The child had lived with the Bowmans his entire life and was bonded to them. Sledd also admitted that the Bowmans loved the child and had the means to support and nurture him.

Sledd testified about her housing and employment situation. She was renting a two-bedroom house and working two jobs. Sledd's work hours varied, but typically included

---

[2] Sledd's revocation hearing was pending at the time of the adoption hearing.

[3] Jordan consented to the adoption.

nights and weekends. She claimed that she could adjust her work hours to accommodate the child's needs. Sledd wanted a larger role in the child's life; she opposed the adoption and had petitioned the JDR court for a change in custody.

Mrs. Bowman testified about her and her husband's situation. She worked Monday through Friday from 8:00 a.m. to 5:00 p.m. Mr. Bowman also worked. The Bowmans had the financial means to care for the child, and Mrs. Bowman had even paid Sledd's and Jordan's minimum monthly support payments to the Division of Child Support Enforcement until November 2019.[4] The Bowmans lived in a three-bedroom home, and the child had his own room. The child had spent only one night away from the Bowmans.

Mrs. Bowman testified about her relationship with Sledd, whom she had considered "like [her] daughter." The Bowmans had invited her on vacations and to Christmas, even after Sledd had moved out of their home. Before April 2019, Sledd came to the Bowmans' house and visited with the child three to five days per week. Then, Sledd had a new boyfriend and her visits became sporadic. Mrs. Bowman testified that Sledd "always puts her boyfriends first," over the child. By November 2019, Mrs. Bowman had informed Sledd that they needed to establish a visitation schedule because Sledd often would not appear for her visits. Sledd, however, continued to miss or reschedule visits. Mrs. Bowman described Sledd's relationship with the child as "a playmate."

Mrs. Bowman described her close relationship with the child and how they were "very attached" to one another. Mrs. Bowman took the child to the doctor and dentist as needed, and even though Mrs. Bowman texted Sledd about the appointments, Sledd never asked to go to the child's appointments. Mrs. Bowman testified that she and her husband wanted to adopt the child

---

[4] Sledd testified that a few days before the adoption hearing, she had paid her outstanding child support obligations, using funds from a life insurance check and her savings.

because they loved him and wanted stability for him. Mrs. Bowman expressed concern that Sledd did not recognize or understand how attached the child was to Mrs. Bowman and how much he needed his routine, which the Bowmans provided.

The Bowmans presented evidence from Dr. Debra Marks, a licensed clinical psychologist, who met with the Bowmans and the child in March 2020. Dr. Marks opined that the Bowmans and the child had "an incredibly stable and nurturing relationship." Dr. Marks found that the child looked to the Bowmans for "guidance and support, protection." Dr. Marks concluded that she had "no doubt that [the Bowmans] deeply care for this child and that he has a very, very strong connection with them." When asked whether the child would benefit from adoption, Dr. Marks opined that "closure would be beneficial to everyone involved and then . . . the Bowmans and [the child] can really focus on helping prepare him for his next stage in life." Dr. Marks believed "[u]nequivocally" that "the most grounded and stable environment for the child at this point is . . . being raised and living with the Bowmans."

At the conclusion of the Bowmans' evidence, Sledd moved to strike, which the circuit court denied. Both of Sledd's employers testified that she was an "amazing" and reliable employee. Sledd's probation officer, who had been monitoring Sledd for approximately one year, testified that Sledd had a "very good start to supervision," but then tested positive for drugs. Afterwards, Sledd completed twenty-four sessions with a substance abuse treatment group and had not had any negative drug screens.[5] Sledd admitted that she was not participating in any further substance abuse treatment programs or Alcoholics Anonymous or Narcotics Anonymous meetings because she had "everything under control." Sledd explained that she had her latest boyfriend evicted from her home a month before the adoption hearing because she

---

[5] The probation department had stopped its weekly drug screening three months before the adoption hearing because of the coronavirus safety measures. Sledd, however, had submitted to a hair follicle test shortly before the adoption hearing; the results were negative.

found out that he was using "meth and pills." Sledd claimed that she no longer wanted to be around drugs or anybody doing drugs.

After hearing the evidence and argument, the circuit court granted the Bowmans' petition for adoption. The circuit court denied Sledd's request to postpone its ruling until after her revocation hearing because the child needed stability and could not be "dangling in perpetuity," waiting for Sledd to "get her act together." The circuit court concluded that it was in the child's best interests to terminate Sledd's parental rights and "permit the adoption." On July 20, 2020, the circuit court entered the final order of adoption. Sledd filed a motion to reconsider and advised the circuit court that her probation violation had been dismissed; the circuit court denied the motion to reconsider. This appeal followed.

ANALYSIS

Sledd argues that the circuit court erred in finding that "the best interest[s] of the child under Virginia Code § 63.2-1205 were met" and in entering a final order of adoption. She emphasizes that after experiencing "great difficulties," she had improved her life, while also maintaining contact and visiting with the child.

"'[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by' the United States Supreme Court." Geouge, 68 Va. App. at 368 (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion)); see also Berry v. Barnes, 72 Va. App. 281, 288 (2020). "We consistently have held that to grant a petition for adoption over a birth parent's objection, there must be more than a mere finding that the adoption would promote the child's best interests." Copeland v. Todd, 282 Va. 183, 197 (2011) (citing Malpass v. Morgan, 213 Va. 393, 398-99 (1972)). "Virginia's statutory scheme for adoption, including Code §§ 63.2-1205 and -1208, defines the best interests of the child in terms

that require more expansive analysis than when the contest is between two biological parents." Id. at 199.

Code § 63.2-1205 states, in relevant part, as follows:

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, . . . the circuit court . . . shall consider whether granting the petition pending before it would be in the best interest of the child. The circuit court . . . shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

The record demonstrates that the circuit court considered the evidence presented and the factors delineated in Code § 63.2-1205. The circuit court commended Sledd on her efforts to obtain employment and housing. The circuit court also considered the procedural history of the case and that the child had lived with the Bowmans since his birth four years earlier. The circuit court had heard evidence of Sledd's motions to modify custody and the child protective order; however, the child protective order remained in place at the time of the adoption hearing. The circuit court found that the Bowmans had not thwarted Sledd's efforts to assert her parental rights, and Sledd conceded that her parental rights were not thwarted. The circuit court further found that Sledd's previous relationship with the child was not of "particularly great quality," and she had missed "a number of opportunities . . . to assume a greater role in [the child's] life." The circuit court noted that Sledd had missed visitations, and Mrs. Bowman had testified that Sledd had never asked to go to the child's medical or dental appointments. Although Sledd claimed that she was able to care for the child, the circuit court disagreed. The circuit court held

that Sledd had had "ample opportunity . . . to have gotten her life straight and assume a better posture relative to [the child]. She [had] not done so."

The child had lived his entire life with the Bowmans, and Mrs. Bowman and Dr. Marks testified about the child's strong bond with the Bowmans. Sledd acknowledges that the Bowmans are "loving grandparents" and have a "suitable home." Sledd further recognizes that a change in the child's home "would have an effect" on him. The circuit court found that "it would be a profound mistake to uproot [the child]." The circuit court held that the child needed stability, which the Bowmans had provided, and that Sledd had been unable to demonstrate.

Considering the record before us, we cannot say that the circuit court erred in finding that the adoption of the child by the Bowmans was in the child's best interests. The circuit court did not err in granting the Bowmans' petition for adoption and entering the final order of adoption. "When, as here, the circuit court reviewed the statutory factors, based its findings on evidence presented, and did not commit legal error, there is no basis for this Court to reverse its decision." Geouge, 68 Va. App. at 372.

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.