COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges Malveaux and Athey
Argued by videoconference

**PUBLISHED**

SHANNON KATHLEEN SMITH HURT LIVELY

OPINION BY
v.        Record No. 1929-19-3        JUDGE MARY BENNETT MALVEAUX
OCTOBER 20, 2020

PAULETTE HOLLAND SMITH AND
 LINK MONROE SMITH

FROM THE CIRCUIT COURT OF TAZEWELL COUNTY
Richard C. Patterson, Judge

Dennis H. Lee (Galumbeck & Kegley, Attorneys, on brief), for
appellant.

Flux Neo (Neo Law Firm, PLLC, on brief), for appellee Paulette
Holland Smith.

No brief or argument for appellee Link Monroe Smith.

Shannon Kathleen Smith Hurt Lively ("mother") appeals the dismissal of her complaint

seeking to set aside her son's adoption by her parents, Paulette Holland Smith and Link Monroe

Smith ("Paulette" and "Link"). She argues the circuit court erred in its application of Code

§ 63.2-1216 to her case. For the reasons that follow, we affirm the circuit court.

I.  BACKGROUND

When reviewing a circuit court's decision on appeal, we view the evidence in the light

most favorable to the party who prevailed below—here, Paulette—and grant them the benefit of

any reasonable inferences.[1]  See Shah v. Shah, 70 Va. App. 588, 591 (2019).  So viewed, the

evidence is as follows.

---

[1] Although a named defendant in this matter, Link filed a statement in support of
mother's complaint and moved the circuit court to set aside the order of adoption.

Mother and J.H. married and had a son, T.S., who was born in 2007.[2]  J.H. was abusive, and he and mother divorced in March 2009.

Also in 2009, mother was sentenced to four years' incarceration for a number of offenses, including felonies.  Mother asked Paulette and Link to assume custody of T.S.  Following an April 2009 hearing, the juvenile and domestic relations district court ("the JDR court") entered an order granting full custody to Paulette and Link.  Mother later testified that at that time her parents told her that their custody of T.S. would be temporary and that when she returned home she would "have [T.S.]" as long as she refrained from using drugs.

In summer 2011, Paulette and Link petitioned the circuit court to adopt T.S.  Mother later testified that she had learned J.H. "was coming after [T.S.], and that grandparents didn't have a leg to stand on in Virginia, and I needed to assign him over . . . so that [J.H.] couldn't get [T.S.] while I was incarcerated."  Link testified that he had several telephone conversations with mother about adopting T.S.  During those conversations, Link expressed concern about J.H. attempting to take T.S. away and also stated his understanding that if T.S. was adopted, he would have access to Link's health insurance.  Mother stated that she was told the adoption would be temporary "until you get home.  It's just a piece of paper."

Felicia de Courcy, counsel for Paulette and Link, mailed mother a consent to adoption form.  She accompanied the form with a cover letter stating that she represented Paulette and Link in the adoption and that "[i]t is my understanding that you are in agreement for the adoption.  Enclosed please find a [c]onsent which you need to sign under oath before a notary."

Mother signed the consent and had it notarized on May 25, 2011.  That day, she also wrote a letter to de Courcy explaining that "[s]ince I received your letter I have been moved to the Deerfield Work Center . . . .  [T]he delay in my response is solely because of my transfer."

_____

[2] We use nonparties' initials, rather than their names, to protect their privacy.

Mother also informed de Courcy that Link held her power of attorney and stated that "if these proceedings can be expedited in any manner, please feel free to exercise th[o]se papers." Mother closed by stating, "I want to take this opportunity to thank you for over-seeing this matter. Your time and attention to our situation is greatly appreciated!"

On August 16, 2011, the circuit court entered a final order of adoption which acknowledged mother's consent and decreed that T.S. was, "to all intents and purposes, the child of Link . . . and Paulette."

Mother was released from incarceration in September 2012 and returned to her parental home in Tazewell County. At that time, Paulette was helping to care for her mother and sister in Ohio and traveled there almost weekly. T.S. accompanied Paulette on her trips since Paulette was providing the majority of his care. Mother testified that between September 2012 and February 2013 she lived first in her parents' home and then in a house next door and that she had resumed her relationship as T.S.'s mother. However, Paulette specifically denied that mother was "raising" T.S. or was his "primary caregiver" during this time. Paulette testified that prior to February 2013, she continued to take T.S. with her on her regular trips to Ohio and that she had T.S. with her "the majority of the time."

In February 2013, following a family argument, Paulette and T.S. left Tazewell for Ohio and began to spend the majority of their time there. Mother testified that after February 2013, T.S. periodically returned to Virginia, but only for visits.

Due to ongoing marital problems, Paulette filed for a separation from Link in October 2014. She subsequently filed for divorce and was awarded primary physical custody.

In August 2015, mother petitioned the JDR court to amend custody. In her handwritten petition, mother requested that full custody be given to her because "Link & Paulette . . . are going through a messy divorce . . . . His biological mother wants to bring [T.S.] home . . . to

- 3 -

avoid him having to go through this mental & emotional stress." The JDR court denied the motion, noting that a final order of adoption had been entered by the circuit court in 2011 and that mother's parental rights had thus been terminated. As a result, mother lacked standing to petition for custody. Mother testified that this was the first occasion on which she realized that her parental rights had been terminated.

In June 2018, following a search for an attorney to represent her, mother filed a complaint seeking to set aside the adoption. Mother alleged that her consent to the adoption had been fraudulently obtained. She further alleged that she had been denied due process during the adoption proceedings since she had been a person under a disability—*i.e.*, an incarcerated felon—and no guardian *ad litem* had been appointed for her. As a result, mother argued, she had understood neither her rights under the circumstances nor the legal consequences of her consent.

Paulette filed a demurrer arguing, in part, that Code § 63.2-1216 foreclosed all challenges to the adoption because more than six months had passed since entry of the adoption order. The circuit court sustained the demurrer with respect to the allegation of fraud and scheduled a hearing on the remaining issues.

At the hearing, the parties testified as described above and mother acknowledged signing the consent form and having it notarized. However, she stated that she had received it without a cover letter and represented that "all [she] got was just a consent form with a sticky [flag] attached to it" indicating where it should be signed. When the notary asked her if she knew what she was signing, mother told her that she did not and that "my parents had sent it to me, and I was supposed to sign it. That was it." Mother also stated that she did not receive copies of the adoption petition or order and that she only saw the order and de Courcy's cover letter when her father showed her the documents after she was released from prison.

- 4 -

Upon cross-examination, mother initially denied having any communications with her parents' attorney during her incarceration. However, when confronted with her May 25, 2011 letter to de Courcy, in which she acknowledged "receiv[ing] your letter" and thanked her parents' attorney for "over-seeing this matter," mother stated that she had "forgot all about writing that" and acknowledged receiving de Courcy's cover letter.

Mother also testified about her understanding of matters at the time of the adoption. She denied that anyone had spoken to her about adoption or used that term prior to her receipt of the consent form in the mail. Mother also stated that when she spoke to Paulette about the adoption over the telephone, she was told that "[she] would always be [T.S.'s] mother, that this was just on paper to protect [T.S.]." Mother denied having been made aware that the adoption would permanently terminate her parental rights; as far as mother understood, the adoption was just a temporary arrangement until she returned home. Mother further testified that no one told her she had the right to object to the adoption, to revoke her consent for a certain period, or to be present for the adoption hearing. When asked on cross-examination what "the word adoption mean[s] . . . to you," mother replied, "[i]t means that parents who can't have children adopt children of their own."

By contrast, Paulette testified that she had never represented that the adoption would be temporary and that she never intended for mother to resume her role as mother to T.S.

Felicia de Courcy testified that at the time of the adoption proceeding, neither Paulette nor Link had represented any expectation to her that the adoption would be temporary in nature. She stated that she had discussed the finality of the adoption with both grandparents at that time, and neither indicated that they did not understand its finality. Further, in 2013, Link telephoned de Courcy to confirm that there was no way mother could "break the adoption" and she assured him that there was not.

The circuit court issued a letter opinion addressing mother's argument that failure to provide due process to an incarcerated parent overcame the statutory bar of Code § 63.2-1216. It first concluded that, due to mother's incarceration for felony offenses, she had been a person under a disability at the time of the adoption proceeding; thus, under the provisions of Code § 8.01-9, a guardian *ad litem* should have been appointed for mother during the adoption.[3] The court then found that mother's rights to due process and equal protection had been violated in the adoption by the failure to appoint such a guardian.

The court next considered whether the violation was of such a nature as to require it to overturn the adoption. In doing so, it noted mother's reliance upon a decision of this Court, F.E. v. G.F.M., 35 Va. App. 648 (2001) (*en banc*). In F.E., the biological father had been unable to read or write English and was fraudulently induced to sign a consent form by the adopting grandmother. Id. at 656-59. After subjecting the statutory limitation period for adoption challenges to strict scrutiny, this Court determined that, under the facts in F.E., the statute had been unconstitutional as applied.[4] Id. at 663-70. The circuit court concluded that F.E. was distinguishable from the instant case, for two reasons. First, while the consent form signed by mother did not inform her of her legal rights, there had been no fraud in procuring the adoption. Second, unlike the father in F.E., mother had clearly understood the English language; thus, there was no notice issue as in F.E. because mother had been aware of the adoption. While she

_____

[3] Code § 8.01-2(6)(a) defines a "[p]erson under a disability" to include "a person convicted of a felony during the period he is confined." Code § 8.01-9(A) provides, in pertinent part, that in "[a] suit wherein a person under a disability is a party defendant . . . the court in which the suit is pending . . . shall appoint a . . . guardian *ad litem* to such defendant." Given our resolution of this case, we take no position on the correctness of the circuit court's ruling that mother should have been appointed a guardian as a "party defendant" in a consensual, close relative adoption.

[4] In F.E. v. G.F.M., the statute at issue was Code § 63.1-237, the predecessor statute to Code § 63.2-1216. See 2002 Va. Acts ch. 747 (adding Title 63.2 to the Code, repealing Title 63.1, and recodifying within Title 63.2 the former contents of Title 63.1).

claimed not to have understood its nature and finality, the court held, mother had clearly known that Paulette and Link were seeking to adopt T.S. and, notwithstanding the lack of a guardian *ad litem*, she had clearly consented to the process. The court concluded that unlike the fraud and notice issues in F.E., the instant case concerned the due process implications of mother's understanding of the term "adoption" and her belief that following her release from incarceration, Paulette and Link would "provide custody [of T.S.] back to her."

Applying strict scrutiny in reviewing the applicability of Code § 63.2-1216 to mother's case, the circuit court found that Link had discussed the adoption with mother and that she agreed with the adoption at that time. She also had understood its goals: to prevent J.H. from attempting to exercise parental rights and to gain insurance coverage for T.S. Mother had then communicated with de Courcy about executing the consent form and expressed interest in expediting the adoption. Further, mother "had previously been involved in a 'custody' case with her parents. This was not a custody case and the [consent] form she executed did not state 'custody.'" The court also credited Paulette's testimony that it was not her intention for mother to obtain "custody" upon her release from prison. Thus, while mother had possessed an expectation that she could involve herself in her son's life after she was released from prison, "this was a mere expectation." The court also placed great significance on the timeline of mother's efforts to challenge the adoption. It noted that although Paulette took T.S. to Ohio in February 2013, approximately five months after mother was released from prison, mother did not seek custody until 2015 and did not seek to overturn the adoption until nearly six years after her release. Ultimately, the circuit court found that

> [it] cannot reconcile . . . [m]other's alleged misunderstanding of the nature of the permanency of adoption with the facts of the case. . . .
>
> Mother was in favor of the adoption in order to prevent the natural father from being able to obtain custody or visitation.

However, the [c]ourt finds it difficult to believe that she did not understand that the permanency of the adoption would not [*sic*] apply to her as well. Obviously, her hope was that her parents would allow her to insert herself in [T.S.'s] life.

Accordingly, the [c]ourt finds that notwithstanding the due process issue as set forth herein, . . . Code [§] 63.2-1216 is not unconstitutional as it applies to the facts of this case.

Since the order of adoption had been entered on August 16, 2011, the circuit court found that it had become final for purposes of attack on February 16, 2012. The court dismissed mother's complaint.

This appeal followed.

## II. ANALYSIS

Mother argues the circuit court erred in holding that Code § 63.2-1216 is not unconstitutional as applied to her case because her due process and equal protection rights were violated in the adoption, in two ways.[5] First, mother was an incarcerated felon during the adoption proceedings and thus was a person under a disability, as defined by Code § 8.01-9(A); yet a guardian *ad litem* was not appointed for her, as the circuit court held was required by Code § 8.01-2(6)(a). Mother asserts that a guardian was necessary to ensure her understanding of the adoption process and to represent her interests. Second, mother argues that the consent form she signed insufficiently apprised her of her due process rights and did not advise her that the adoption would permanently terminate her parental rights. Ultimately, the gravamen of mother's argument is that she was insufficiently informed about the nature and legal consequences of the

---

[5] Mother assigns four errors to the circuit court but presents only a single argument on brief. That argument, which purports to address mother's first assignment of error, is then adopted and restated by reference to address the remaining assignments of error. Consequently, we confine ourselves to addressing mother's single argument as presented on brief.

adoption and of her consent to it. Thus, like the biological father in F.E., she argues that she should not be precluded from challenging the adoption by the application of Code § 63.2-1216.

"[C]onstitutional arguments are questions of law that [this Court reviews] *de novo*." Milot v. Milot, 62 Va. App. 415, 422 (2013) (alterations in original) (quoting Copeland v. Todd, 282 Va. 183, 193 (2011)). However, "this Court 'will not disturb the factual findings of the [circuit] court unless plainly wrong or unsupported by the evidence.'" Canales v. Torres Orellana, 67 Va. App. 759, 773 (2017) (*en banc*) (quoting Commonwealth v. Anderson, 278 Va. 419, 425 (2009)).

The statute at issue here, Code § 63.2-1216, provides that

> [a]fter the expiration of six months from the date of entry of any final order of adoption from which no appeal has been taken to the Court of Appeals, the validity thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person, and such order shall be final for all purposes.

This Court has previously noted that "[t]he purpose of the statute is clear. The General Assembly made the policy choice to favor finality, recognizing that repeatedly subjecting a child to multiple changes in or even mere challenges to who his legal parents are has the potential to cause significant harm to the child." Nelson v. Middlesex Dep't of Soc. Servs., 69 Va. App. 496, 509 (2018).

"The due process clauses of the Federal and Virginia Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law." F.E., 35 Va. App. at 661 (quoting Hess v. Snyder Hunt Corp., 240 Va. 49, 52 (1990)). See also U.S. Const. amend. XIV; Va. Const. art. 1, § 11. Further, "[t]he Equal Protection Clause of the Fourteenth Amendment forbids any state to deny a person within its jurisdiction the equal protection of the laws." Copeland, 282 Va. at 201.

"[A]ll actions of the General Assembly are presumed to be constitutional." Id. at 193 (quoting Va. Soc. For Human Life, Inc. v. Caldwell, 256 Va. 151, 157 (1998)). Consequently, "courts will declare an enactment unconstitutional only when it clearly is repugnant to some provision of either the state or federal constitution. The party challenging the enactment has the burden of proving its unconstitutionality," and a reasonable doubt as to its constitutionality "must be resolved in favor of its validity." Hess, 240 Va. at 52-53. "[U]nder the general rule, a statute is not violative of due process if it withstands a 'rational basis' test. When, however, a statute affects a fundamental right . . . , its constitutionality will be judged by the 'strict scrutiny' test." Id. at 53 (first quoting Etheridge v. Med. Ctr. Hosps., 237 Va. 87, 97 (1989); then quoting Mahan v. Nat'l Conservative Pol. Action Comm., 227 Va. 330, 336 (1984)). Thus, "[w]hen a statute 'significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.'" F.E., 35 Va. App. at 662 (quoting Zablocki v. Redhail, 434 U.S. 374, 388 (1978)).

The parent-child relationship "is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment. Indeed, the Supreme Court of the United States has characterized a parent's right to raise his or her child as 'perhaps the oldest of the fundamental liberty interests recognized by [the] Court.'" L.F. v. Breit, 285 Va. 163, 182 (2013) (citations omitted) (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000)). Thus, "[a]ny statute that seeks to interfere with a parent's fundamental rights survives constitutional scrutiny only if it is narrowly tailored to serve a compelling state interest." Id. This Court has previously recognized that "the state has a compelling interest in '[preserving] stability in a family relationship, particularly when a young minor is involved.'" F.E., 35 Va. App. at 664 (quoting McKinney v. Ivey, 698 S.W.2d 506, 507 (Ark. 1985)).

- 10 -

Mother argues the circuit court erred in finding that Code § 63.2-1216 is not unconstitutional as applied to her case in part because a guardian *ad litem* was not appointed for her during the adoption, and thus her rights to due process and equal protection were violated. As noted above, the court did find that mother should have had the benefit of a guardian *ad litem* during the adoption process and that the failure to appoint one constituted a violation of her rights. Thus, mother's initial argument raises an issue upon which the circuit court agreed with her and ruled in her favor. However, the court then held that notwithstanding its finding, the statute was not unconstitutional as applied to the facts of mother's case. Consequently, the question here is whether, assuming *arguendo* that the circuit court was correct with respect to the guardian *ad litem* and violation of mother's rights, the facts of this case support mother's argument that she did not understand the nature and consequences of her consent and the adoption and thus was denied due process.

Viewing the evidence in the light most favorable to Paulette, the evidence supports the circuit court's finding that mother's alleged misunderstanding of the nature of the adoption cannot be reconciled with the facts of the case. Mother executed a form that represented that she consented to the adoption of T.S. by Paulette and Link. Although the consent form did not specify the nature of the adoption, including that it would be permanent and would permanently terminate mother's parental rights, mother did not sign the consent form in a vacuum. Despite mother's initial testimony that she executed the consent form without receiving any communications about it and that she told the notary she was supposed to sign it for her parents but did not know what she was signing, on cross-examination she admitted corresponding about the adoption with de Courcy. Mother wrote de Courcy the same day she executed the consent form, acknowledging receipt of the cover letter which had made clear de Courcy's understanding that mother agreed with the adoption. de Courcy testified that she had discussed the finality of

- 11 -

the adoption with both Link and Paulette and that neither had indicated that they did not understand that the adoption would be final. Although mother denied that anyone had spoken to her about adoption or used the term adoption with her prior to her receipt of the consent form, Link testified that he had several telephone conversations with mother about adopting T.S. Mother also acknowledged speaking with Paulette about the adoption over the telephone, and Paulette testified that she never represented to mother that the adoption would be temporary.

Mother also understood the objectives of the adoption to which she consented—to protect T.S. from J.H. and allow Link and Paulette to more fully care for him. Mother and her parents had previously participated in a custody proceeding that resulted in an award of custody of T.S. to Paulette and Link. Mother testified that she had understood the custody arrangement to be a temporary one, intended to provide for T.S.'s care until she returned from prison. Nothing in the record indicates that mother or her parents failed to understand the nature of custody or the legal effects of an award of custody. When they later became concerned that custody alone might not adequately protect T.S. from J.H. and that it might be insufficient to allow T.S. access to certain health care benefits, mother, Paulette, and Link pursued adoption. Although mother testified that she thought the adoption was simply another custody-type arrangement, and thus that it would be temporary, she had, as noted by the circuit court, "previously been involved in a 'custody' case with her parents. This was not a custody case and the form she executed did not state 'custody.'" Thus, the record supports the reasonable inference that when mother signed the form indicating her consent to T.S.'s adoption, she understood that she was agreeing to a new legal arrangement that went beyond what mere custody had provided. In turn, the fact that mother was in favor of the adoption in order to prevent J.H. from becoming involved with T.S. supports the circuit court's conclusion that "it [is] difficult to believe that [mother] did not understand that the permanency of the adoption [with respect to J.H.] would not [*sic*] apply to her as well."

Mother's understanding that the adoption would be permanent rather than temporary is further supported by her testimony that to her, adoption means "parents who can't have children adopt[ing] children of their own."

Mother's conduct after her return home further supports that she understood the nature and permanency of the adoption to which she consented. Mother testified that at the time of the adoption proceeding, she did not receive copies of either the petition or the final order of adoption. She stated that she finally saw a copy of the order when she returned home from prison in 2012 and her father showed her the document. The order made clear that from August 16, 2011, T.S. would "be, to all intents and purposes, the child of Link . . . and Paulette." Nothing in the plain language of the order indicated that the adoption would or could be anything less than permanent. Nevertheless, mother took no steps to challenge the adoption. Moreover, the evidence viewed in the light most favorable to Paulette indicates that although mother had contact with T.S. during the period immediately after mother returned from prison, Paulette was still providing the majority of care for T.S., the child was frequently in Ohio with Paulette, and mother was neither "raising" T.S. nor his "primary caregiver." In February 2013, Paulette relocated to Ohio with her adoptive son. Only in August 2015, in response to a "messy divorce" between Paulette and Link, did mother approach the courts about T.S., and then only to move the JDR court for custody. Although mother testified that after the JDR court denied her motion in October 2015 she knew that her parental rights had been terminated, she did not initiate the instant case until June 2018. The circuit court noted that in making its ruling, it could not overlook the time that had passed from the final order of adoption to the complaint. The facts noted above support that this timeline is significant. They further support a reasonable inference that mother consented to an adoption she knew would be permanent and only took action to challenge the adoption in response to the subsequent breakdown of her parents' marriage.

Here, the circuit court ruled that even though a guardian *ad litem* should have been appointed for mother during the adoption, and even though the failure to do so violated mother's due process and equal protection rights, Code § 63.2-1216 was not unconstitutional as applied to the facts of this case. We agree with the circuit court's ultimate ruling. Even assuming, *arguendo*, that the court was correct with respect to the guardian *ad litem* and concomitant rights violations, it is clear that the totality of the facts supports a finding that mother did not lack understanding of the nature and legal consequences of her consent and the adoption. The statute at issue here, Code § 63.2-1216, provides that six months after the date of entry of an order of adoption that has not been appealed, that order becomes "final for all purposes" and "shall not be subject to attack . . . for any reason," including those alleged here. This Court has previously noted the clear purpose of the statute—to favor finality of a child's adoption and thus forestall changes in or challenges to "who his legal parents are," which "ha[ve] the potential to cause significant harm to the child." Nelson, 69 Va. App. at 509. Although mother has a fundamental liberty interest in raising T.S. as her child, the countervailing state interest in serving T.S.'s best interests by ensuring finality, and thus stability, in his parenting is a compelling one. Further, it is achievable only by means of preventing tardy challenges to T.S.'s adoption, including the one raised here nearly seven years later and more than five years after T.S. moved to Ohio with his adoptive mother, Paulette. Thus, even applying the heightened review standard of strict scrutiny, it cannot be said that the circuit court erred when it held that Code § 63.2-1216 is not unconstitutional as applied to the facts of mother's case.

Lastly, although mother argues that the facts of her case are sufficiently analogous to the facts of F.E. that, like the biological father in that case, she should not be precluded from challenging the adoption outside the statutory limitation period, F.E. is readily distinguishable. As noted by the circuit court, in F.E., unlike in the instant case, the biological father could not

read English and relied upon the false representations of the adoptive mother about the contents of the consent form he signed.  F.E., 35 Va. App. at 657.  Consequently, this Court, sitting *en banc*, held that the circuit court erred when it granted the adoptive mother's demurrer, because the facts alleged by the biological father, if true, established extrinsic fraud, lack of notice, and lack of personal jurisdiction over him.  Id. at 665.  None of those facts or bases for challenging the adoption of T.S. is present here.

### III.  CONCLUSION

For the reasons set forth above, we affirm the decision of the circuit court.

Affirmed.