# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Russell, Lorish and Senior Judge Annunziata
Argued by videoconference

ALEXANDRA MULVEY

                                                                                    MEMORANDUM OPINION[*] BY

v.        Record No. 0460-21-4          JUDGE WESLEY G. RUSSELL, JR.
                                                                           MARCH 15, 2022

GERALD PHILIP RHOADS AND
 LINDA MACNALLY

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Kimberly A. Irving, Judge

Thomas H. Roberts (Thomas H. Roberts & Associates, PC, on briefs),
for appellant.

Donna Dougherty (Kate Beurmann-O'Neill; Family Law Group, on
brief), for appellees.

Alexandra Mulvey appeals a final order terminating her parental rights and granting the

adoption of her biological daughter by Linda MacNally, the wife of the child's father, Gerald Philip

Rhoads. She challenges the sufficiency of the evidence and actions taken by the trial court in

conducting the evidentiary hearing. For the reasons that follow, we reverse.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

Mulvey and Rhoads were involved in a short-term relationship in 2008. Mulvey gave birth to a daughter, T.M., on July 8, 2008.[2] Rhoads was not present at the birth, but he met T.M. for the first time later in the week and enjoyed sporadic visitation with her for the first few years of her life. Throughout T.M.'s life, Mulvey lived in several places, including Martinsburg and Shepherdstown, West Virginia and Alexandria, Virginia.

Rhoads met MacNally in 2010. They married in August 2013.

Until 2013, Mulvey had sole physical custody of T.M. Despite having no contact with T.M. for two years, Rhoads initiated custody and visitation proceedings in Virginia, but initially was unable to find Mulvey in order to serve her. He enlisted the help of a private investigator to locate her. Mulvey began to believe that Rhoads was attempting to stalk her. In 2013, pursuant to a Virginia court order, police physically removed T.M. from Mulvey's custody and T.M. went to live with Rhoads and MacNally. Three months later, T.M. was returned to Mulvey and extensive litigation ensued. T.M. was five years old.

---

[1] In general, we "view the evidence in the light most favorable to the party prevailing below, giving it all reasonable inferences fairly deducible therefrom." *Harvey v. Flockhart*, 65 Va. App. 131, 145 (2015) (quoting *Winfield v. Urquhart*, 25 Va. App. 688, 690 (1997)). The exception to this general rule is when the trial court expressly makes a finding. When a trial court makes a specific finding or disavows a potential inference from the evidence, we are bound by such determinations and "will not . . . set [them] aside unless they are plainly wrong or without evidence to support them." *Frouz v. Commonwealth*, 296 Va. 391, 399 (2018) (quoting *Riverside Owner, L.L.C. v. City of Richmond*, 282 Va. 62, 75 (2011)).

[2] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues Mulvey has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

A December 2014 hearing in West Virginia resulted in an order awarding Mulvey and Rhoads joint legal custody and Mulvey primary physical custody. Rhoads was granted weekend and holiday visitation. The West Virginia court appointed Dr. James P. Behrmann to serve as a parent coordinator and directed that Mulvey and T.M. continue to participate in therapy. Mulvey was further ordered to enroll T.M., who had been homeschooled up to this point, in a school by January 1, 2015.

Mulvey did not enroll T.M. in a school until March and failed to comply with other provisions of the order. In May 2015, Rhoads filed a petition to modify the custody arrangement. At an October 2015 hearing on the petition, the guardian *ad litem* (GAL), T.M.'s therapist, and Dr. Behrmann all recommended that custody be shifted to Rhoads, with Mulvey permitted to exercise only supervised visitation. In a November 2015 order, the West Virginia court relayed that it was "not prepared to make a finding that [Mulvey] suffers from an incurable mental illness" but credited Dr. Behrmann's and the GAL's opinion that Mulvey experienced paranoia and that the paranoia had a detrimental effect on T.M. Citing late school enrollment, alienation from Rhoads, and T.M.'s sharing Mulvey's fear that they were in danger, the West Virginia court determined that "the existing parenting plan is not working as contemplated and is manifestly harmful to the child[.]"

Based on its findings, the West Virginia court awarded sole legal and physical custody to Rhoads and granted Mulvey supervised visitation every other weekend provided that "the minor child NOT be left alone with [Mulvey]." The court order further provided that Dr. Behrmann have "complete authority to coordinate" the visitation, to include termination "pending a modification hearing." The West Virginia court also awarded Rhoads $50 monthly child support. Mulvey failed to pay the support from 2015 to 2017.

On February 2, 2016, the West Virginia court entered a final modification order and order relinquishing jurisdiction.  The order maintained Dr. Behrmann as a parenting coordinator with "complete authority to coordinate M[ulvey]'s" visitation and "modify or terminate [her] supervised visitation pending a modification hearing."  The order further "relinquishe[d] modification and enforcement jurisdiction" to allow Rhoads to commence proceedings in Virginia "on or before February 15, 2016."

Rhoads registered the West Virginia order with the Prince William County Juvenile and Domestic Relations District Court (JDR court) on February 12, 2016.  In March 2016, Dr. Behrmann directed that Mulvey's weekend visitation be cancelled and replaced with therapeutic supervised visitation.  Rhoads filed a motion to modify custody and visitation in the JDR court, but his petition was dismissed in June.

In September 2016, Mulvey filed a motion to amend visitation seeking supervised visitation, and in November she filed a "motion for *pendente lite* relief" to which Rhoads filed a cross-motion to amend visitation.  On March 17, 2017, the JDR court entered an order allowing visitation to resume every other Saturday under the supervision of Kathleen Bell or National Counseling Group.

Although a review hearing was set for July, in May 2017, Rhoads filed an emergency motion to change the visitation supervisor based on an allegation of "inadequate supervision."  In December 2017, the JDR court entered an order awarding Mulvey three hours unsupervised visitation every other Saturday, conditioned on her having a phone with her, but on February 2, 2018, the JDR court entered another order again directing that visitation be supervised by Bell or as otherwise agreed to by the parties.

Over the years, Rhoads noticed occasional bruising on T.M., but he did not take her to the doctor.  He filed Child Protective Services (CPS) reports, but each inquiry resulted in a finding of "unfounded."  On one occasion, he also brought T.M. before a magistrate in West Virginia to seek

emergency custody. In 2015, T.M. was diagnosed with PTSD. Based on observations of T.M.'s behavior after visitations with Mulvey, Rhoads hired Sylvia Haydash, a licensed clinical social worker, in February 2016 to serve as T.M.'s therapist. Haydash saw the child once a week unless circumstances warranted two visits.

T.M. was put on medication in 2017; she was initially compliant, but began to stop taking them when unsupervised visitation resumed. While T.M. was not taking her medications, Rhoads and MacNally noticed an increase in violent reactions from her. There were episodes of screaming, threatening, kicking, and throwing things. At one point, she pulled a knife on Rhoads in resistance to being disciplined. In April 2019, her mental state worsened to the point that she was admitted to a hospital for in-patient care based on suspected suicidal tendencies.

Rhoads and MacNally filed a petition for stepparent adoption with the Prince William County Circuit Court in the spring of 2019. They alleged that T.M. had lived with them for approximately three and a half years and "has a significant relationship with [MacNally, who] has had a strong and loving relationship with [T.M.] since 2013 . . . ." They further alleged that Mulvey's "consent to this adoption is withheld contrary to the best interests of" T.M.

Mulvey filed an objection to the petition. She requested an independent custody evaluation, but the trial court ordered an investigation by the county's Department of Social Services (Department). The Department issued a report on February 26, 2020. The report relayed that Rhoads and MacNally were "providing the adoptee with a loving, structured, and safe home environment, where all her needs are met." The Department determined that T.M. "appears to be well adjusted and comfortable in the home . . . [and] to be cared for in every aspect. It appears that it is suitable for the adoptee to be adopted by Ms. MacNally." Determining that "MacNally is financially, morally suitable, and is the proper person to care for and train the child[,]" the

Department "recommend[ed] that a Final Order of Adoption be entered, omitting the interlocutory order and period of probation . . . ."

The trial court conducted a three-day trial in October 2020. The trial court heard testimony from the parties, therapists, and counselors. The trial court also received previous court orders, expert reports, and photographs into evidence.

Rhoads and MacNally testified to their observations of the changes in behavior that T.M. exhibited leading up to and following her visits with Mulvey and how things "smoothed out" after visitation stopped. MacNally testified to her relationship with T.M. and T.M.'s relationship with her half-siblings. Also discussed were the efforts they were taking to assist T.M. with her issues.

Haydash testified to the opinions of T.M.'s condition that she formed as T.M.'s therapist. Haydash noted that T.M. "has a tendency to disassociate" and when that occurs, "she escalates her behavior" necessitating additional sessions during the week. When asked what would trigger the dissociative behavior, Haydash responded, "Great fear. Visits, when the visitation with her mother began. A couple of times it stopped and it started. During that time it was very difficult for her to deal with reality."

Haydash acknowledged a letter she had written in January 2017 in which she objected to unsupervised visits "because of how fragile T.M. is." Haydash relayed that "the supervised visits were not going very well" and that she was concerned because T.M. "wanted to see me almost immediately after all of her visits." Haydash observed that, during these sessions, T.M. "would come in and she would just be shaking and very, very upset, and sometimes even tearful." Sometimes the child would curl up in a ball. Haydash testified that T.M. had "alleged that [Mulvey] was doing things to her and that she was afraid to have these visits with her[.]" One such reported incident involved Mulvey "pulling" the child's hand and cleaning her fingernails. When T.M. resisted and "pulled her fingers back, her mother yelled at her and

- 6 -

pulled her hand back." Haydash noted that T.M. "is very, very sensitive to yelling" and "doesn't like pain." Haydash confirmed that in 2019 she recommended that all visits and calls stop because she "did not feel it was in [T.M.'s] best interest to have any contact."

Haydash testified that T.M. exhibited both flight and fight defense mechanism responses and attested to making progress with her. Haydash noted that T.M. experiences flashbacks of bad memories and "finds it very difficult to understand that the person who she sees as her mother figure has been very abusive towards her." Haydash reported that this "creates a dissonance in her brain[,]" whereby "she can't reject her mother because of the innateness of that trait, but she knows that if she goes with her mother, in her mind, that she will be hurt." Haydash recommended that contact with Mulvey cease, in part, because of the "limbo" T.M. had been in "for over five years" and because "she isn't integrated the way she wants to be in any family system."

On cross-examination, Haydash acknowledged that she had had no contact with Mulvey and that her understanding of T.M.'s case history in large part came from reports from Dr. Behrmann and Bell. Haydash also noted that T.M. has a tendency to look for validation from the adults in the room. She conceded that she had undertaken no independent investigation into abuse allegations or root causes of T.M.'s condition, but she confirmed that disassociation could be symptomatic of PTSD.

Rhoads and MacNally called Dr. Ronald Federici, a board-certified child psychologist, as an expert witness. Rhoads had engaged him "to do a comprehensive neuropsychological evaluation [of T.M.]" because Rhoads "was concerned about her status since she had not had a full psycholog[ical], or comprehensive evaluation in several years, and she was deteriorating and he felt that the[y] needed an expert evaluation." In conducting evaluations, Dr. Federici follows a three-step process whereby first the family fills out a packet to provide background financial,

education, and legal information; he then meets with the family to review that information; finally, he meets with the child. With respect to T.M., he also had discussions with Haydash. Dr. Federici testified that he relied more on court documents than Rhoads in ascertaining T.M.'s case history. He met with T.M. in April 2019.

When asked to opine on T.M.'s mental health, Dr. Federici stated that she "is a very damaged child from more than post-traumatic stress disorder, . . . [which] was already in . . . her history," and "what we believe is now more appropriately called developmental trauma disorder." He explained, "it's not just [] an episode . . . it's an entire lifestyle during their early formative years from birth all the way, the most critical periods are to three years old, where children are living in a perpetual state of fear, anxiety, chaos and confusion." He asserted that "kids . . . wait until they have the opportunity to fall apart in a safe environment."

Dr. Federici found T.M. to be "fragile" and "dissociative" so that "with any hour she would shift from personality style to personality style, anxiety was debilitating, she was overwhelmed." He reported that "[s]ometimes she would make random movements and statements" and "do bizarre facial expressions, body language." He further described her as "fractured," meaning she was cognitively "scattered" and exhibited an inability to focus or be organized. He noted that her pictures and stories "were about hate, fear, worry, death, and dying preoccupations, vivid recollections of childhood trauma, chaos, confusion, disorganization." He described her as being in a "perpetual state of fear." He also reported that T.M. suffered from poor self-esteem and had "quite a bit of issues regarding her development with her family of origin, with her mother," and that she was "acutely aware of the conflictual nature of the [c]ourt proceedings." Dr. Federici asserted that T.M. "was pretty much falling apart and was very much out of control and would have brief psychotic episodes" where she "would be calm and then get

wild and crazy."  In light of his observations and her hospitalization, Dr. Federici considered T.M. to be "a very acute case."

Dr. Federici ascribed T.M.'s mental health to "either abuse, neglect, chaos, confusion, poor parenting, moves, people in an[d] out, any number of factors, a multitude of factors" and testified that "[t]he most formative periods where children will fracture is from birth through two/three, that's the foundation of ego development and stability, bonding, attachment, [which becomes] well situated within the first . . . three years of life."  Upon questioning regarding the "back and forth between supervised, unsupervised, and no contact with" Mulvey in 2017 and 2018, Dr. Federici opined that that "caused even further developmental trauma, because it was chaotic."  Explaining that a "child needs the status quo, they need one place, one person, one therapy," Dr. Federici stated that "[a]nything further in continuation of that would put her over the edge and quite frankly in my professional opinion, it did, it put her over the edge."

When asked about T.M. having contact with Mulvey, Dr. Federici "did not make any specific recommendation," but stressed that T.M. "needed a great deal of stability, safety, security, and . . . a tremendous amount of therapeutic" intervention.  He further commented that he had suggested "nothing specific about the mother except that . . . if there was contact with the mother, it should be done . . . under supervision[, for when there is] this level of severe trauma, one must be very cautious and not put one back, a child back in a situation that could potentially be further damaging."  He expressed that he "would be very concerned regarding her emotional wellbeing" if T.M. were to be exposed to anything that could set her off, and he feared that, with further deterioration, "we would lose this child to either suicide or further disassociation."

The trial court also questioned Dr. Federici.  It asked whether T.M.'s condition could be "because she was taken from her mother" when she was five.  He said that, while it could be "another contributor to the developmental trauma," the incident "alone would not be the sole

cause to where T.M. is today." Instead, T.M.'s "traumatic development" "fractured her early developmental stability, safety, security, and attachment zero through three, and it just kind of escalated over time." The trial court also confirmed what he had reviewed in arriving at his conclusions.

Dr. Teresa Lear, an expert in attachment and traumas, also testified on Rhoads' and MacNally's behalf. Dr. Lear conducted an attachment evaluation between T.M. and MacNally, whom she observed together in November 2019. She also interviewed MacNally alone and observed T.M. alone. Regarding T.M., Dr. Lear relayed that "it didn't appear that she had a strong sense of family or home." Regarding MacNally's and T.M.'s interaction, Dr. Lear "noticed that there was not a strong attachment between them," but there were some "weak" indicators of "what might be able to grow into an attachment."

Based on assessment scores, observation, and interviews, Dr. Lear further believed that T.M. suffered from "[r]eactive attachment disorder, parent-child relationship disorder, child neglect, [and] child abuse" and suspected child psychological abuse. Dr. Lear agreed that an attachment is ruptured when a child has been removed from the care of a caregiver abruptly, and just placed with another caregiver, but was dismissive of attributing T.M.'s condition to her removal from Mulvey. Dr. Lear acknowledged that most of her information regarding T.M.'s early environment had come from MacNally, but she was adamant that for reactive attachment disorder to occur, the damage and trauma had to occur prior to age five.

During Mulvey's testimony, she struggled to give a coherent account of her living situations since T.M.'s birth. She denied ever having had abused T.M. and attributed T.M.'s PTSD to the 2013 removal. She recounted her concerns regarding Rhoads' surveilling her and expressed her belief that T.M. was being coerced into making statements. She acknowledged an instance when she asked T.M. to remove her watch in order to prevent them from being tracked. Mulvey testified

- 10 -

that her visitation supervisors had never advised her that she was doing anything abusive or threatening, but she acknowledged that they did redirect her occasionally.

Mulvey called as an expert Karen Hobbs, a licensed professional counselor. Hobbs met Mulvey in September 2019 and performed a mental status examination based on observations and interviews with her over a few sessions. Hobbs also performed a Myers-Briggs personality assessment. Hobbs had been seeing Mulvey once or twice a month since they first met.

Hobbs reported that Mulvey had an appropriate thought process. Hobbs noted that Mulvey exhibits anger about not seeing T.M., but "does well for someone who has not been able to have contact with her child." Hobbs testified that Mulvey "can get fixated on certain things" as a result of Asperger's type traits and explained that "she feels that there's been something unjust" and will "try to find any evidence, any proof, anything, that would, would right the wrong that [she] feel[s] has been done to [her]."

Hobbs noted that Mulvey had no history of substance abuse and presented no safety concerns. Hobbs believed that Mulvey was a good mother. On cross-examination, Hobbs acknowledged that she did not have T.M.'s psychological reports or previous court orders and that her report was based mainly on Mulvey's self-reporting. Without objection, the trial court asked additional questions of Hobbs to ascertain the bases of her opinions and to verify the scope of her work with Mulvey. Hobbs indicated that her views might change upon learning certain additional information.

At the close of the evidence, on October 28, 2020, the trial court issued a ruling from the bench. The trial court first noted that "the issue is whether Ms. Mulvey is withholding consent contrary to the best interest of [T.M.]." The trial court summarized the case by finding that when T.M. was five, Rhoads was trying to find and serve Mulvey, who was "moving around a lot at that

time." The court "believe[d] that he hired a private investigator to do so" and concluded "there's not any credible evidence of . . . ongoing stalking behavior[.]"

The trial court then cited a 2014 "evaluation by the child's therapist that says the child should be moved; she has a fear of [Mulvey]." Noting the year, the trial court commented that it was not "bypass[ing] over the three months that [T.M.] was taken from [Mulvey] and recognize[d] that to be a traumatic factor." The trial court continued, however, to find, "[b]ut she went back [to Mulvey] within three months . . . and everybody has said from that time on, every expert in this case who has met [T.M.] has said that [she] is afraid of Mulvey[.]"

The trial court then highlighted the West Virginia court orders before it, which the trial court determined contained "findings of fact" upon which it could rely. The trial court noted that "the findings of fact involve custody, the counselor not seeing [T.M.] when she should, [Mulvey] not putting [T.M.] in school until March, [and Mulvey] not keeping up with the parent coordinator." The trial court stated,

> It is incredibly concerning to me that . . . [in] 2015 when custody was finally switched to [Rhoads], after the [other c]ourt essentially said look, I know the experts are saying that custody needs to be switched, but [Mulvey has] had primary physical custody for five years and I'm not going to take this child from her mom. But I am going to order a parent coordinator and therapy continue, and child needs to get into school and I want that to happen by January 1. And these are the things that I need done in order for this to maintain. And it was a colossal failure.

The trial court found that "[t]he efforts once given a guideline of what needs to happen were minimal at best and harmful to [T.M.] at worst."

The trial court nonetheless found without "any doubt" that Mulvey was willing to assume custody of T.M. and was financially and physically able to do so. The trial court found, however, that Mulvey was not able to provide for T.M.'s emotional needs, stressing Mulvey's inability to make T.M. feel safe and noting that "[f]eeling safe is the most important thing to a child." The trial

court further found no "evidence that [Rhoads] thwarted her contact[,]" but acknowledged "there is some allegation obviously that contact has been thwarted by the courts because they keep finding that she shouldn't have contact unless she does X, Y and Z. However, she fails to comply with that."

The trial court reiterated:

> The overarching theme in the problems here are that [T.M.] doesn't feel safe with [Mulvey]. [She] is scared of [Mulvey and] doesn't feel safe in her environment when she's with [Mulvey], . . . largely because [Mulvey] doesn't feel safe. [Mulvey] has projected that completely and totally onto [her daughter]. The evidence is full of that. . . . And it was clear in 2015. It was clear in 2014 when the experts . . . in West Virginia said [T.M.]'s afraid. . . . [T.M.] believes she lives in a world where people are constantly following, and that's a problem. You're shattering the security that a child needs, and . . . you've shattered the security for [T.M.] so much that the detrimental effect to her is outrageous.

The trial court considered that Mulvey and T.M. "at some point had decent time periods . . . [and] had fun together at times[,]" but it ultimately determined that it "ha[d] to weigh that against the quality of the relationship being that [T.M.] came out of that scared." The trial court noted that it "would have liked to have an answer to" why she is so scared, but could find "no solid answers."

The trial court stated that it had relied heavily on the expert testimony that had been admitted and expressly found "Haydash to be a credible witness" as "[T.M.'s] primary therapist[.]" Dr. Federici was considered "to be cocky, slightly obnoxious," but not "a liar." Although the trial court found him "overly sure of his own way of doing things in a way that was slightly uncomfortable," such that his credibility was affected, the trial court weighed heavily that "his educational background is impressive." The trial court further noted that his "long-term work in these fields with adoption is also impressive."

The trial court stressed that "this idea of fracturing personality is serious. And it doesn't happen in a vacuum." Although unable to pinpoint the source of the problem, whether abuse, lack

- 13 -

of stability, or security concerns, the trial court found that, "[f]or whatever reason, [T.M.'s] makeup, that harmed her. Something harmed her to the point that she is on the verge of actually splitting into different personalities." The trial court explained, "so when Dr. Federici tells me that is where she is, I believe it." The trial court further "believe[d] it because [looking] back to the West Virginia orders, there is mention of it back there. There is mention of her disassociating . . . [and] these problems already formulating."

The trial court also credited Dr. Lear, who "was clear that reactive attachment disorder can only happen when the bonds are not appropriately formed in the early formative years, 0 to 5. All of the evidence says that [Mulvey] was the primary caregiver at 0 to 5." The trial court found Hobbs credible but deemed "her evaluation and formulation of opinions to be weak." The trial court did not give Hobbs' opinions much weight because it found that they were only based on cursory review.

In evaluating the expert testimony, the trial court considered that many never met with or spoke with Mulvey. The trial court further noted how it ultimately deemed causation immaterial to its reasoning. The trial court expressly stated that it "did not find Ms. Mulvey to be credible."

With respect to "the duration and suitability of the child's present custodial environment[,]" the trial court concluded that T.M. "is doing better." The trial court recounted that T.M. has been in therapy since being placed in Rhoads' custody and found "that each time that she visited with [Mulvey], she unraveled."

The trial court ultimately found that T.M. "is one or two traumatic events away from shattering" and that "at the times that she sees [Mulvey] becomes traumatic, for whatever reason." Unable to determine the root cause, the trial court relied on "every professional" in the case's history "say[ing] that any change in custody would be incredibly detrimental" to T.M., whereby "it would shatter the makeup of her brain right now in possibly a way that would be not fixable."

- 14 -

Asserting that this situation "can't be overstated[,]" the trial court weighed this factor heavily because T.M. "has these mental health diagnoses that are important."

Citing *Copeland v. Todd*, 282 Va. 183 (2011), the trial court stated that it was proceeding "under the standard of the consequence of harm to the child, [whereby] allowing the parent-child relationship to continue [is] more severe than the consequences of its termination." The trial court determined that "the detrimental effect of a continued relationship with [Mulvey] far outweighs the trauma of severing the parent-child bond" and that T.M. "needs to belong to a family. That is what everybody has said." The trial court then concluded "that consent is being withheld contrary to the best interest of" T.M.

The trial court entered a final order of adoption on December 11, 2020. Per the order, the trial court found that Mulvey "withheld consent to the . . . petition contrary to the child's best interests" and "determined that it is in the best interests of [T.M.], to be adopted by [MacNally]." The order incorporated the specific findings that the trial court had made on October 28, 2020.

Mulvey objected to the order and filed a motion to rehear, contending that the trial court "err[ed] by depriving her of the fundamental right as a natural parent to maintain a continuing relationship with her child, by . . . erroneously focusing on the father's efforts rather than on mother's efforts to maintain a continuing relationship with the child" and by conflating the best interests standard for custody proceedings with the standard applicable in adoption proceedings. Mulvey further contended that she "is not an unfit parent and therefore severing the relationship between her and her daughter violates the intent of Code § 63.2-1205 and the Virginia and United States constitutions."

The trial court suspended execution of the adoption order to consider Mulvey's motion to rehear, and a hearing on the motion was held on April 30, 2021. Among the issues raised at the hearing was the trial court's failure to make an express finding that Mulvey was an unfit parent.

- 15 -

Rhoads and MacNally asserted that the trial court nonetheless had made an implicit finding of unfitness. The trial court stated that it "had considered" the issue. Despite requests from both parties, the trial court never expressly addressed the question of Mulvey's fitness as a parent.

In clarifying its ruling, the trial court explained,

> The evidence I heard that I gave weight to, and most of it the unobjected testimony and facts, were that [T.M.'s] mental health suffers greatly at seeing [Mulvey] and at the prospect of seeing [Mulvey] and that she needed security, stability and a home where that was not any longer a possibility.

Upon concluding its review of its ruling, the trial court indicated that it had not improperly "do[ne] best interest of the child based on the custody and visitation factors" rather than the adoption standard or misapplied the law, but it had "weigh[ed] . . . the factors with [Mulvey] and the factors with [T.M.]."

By order entered on April 30, 2021, the trial court denied Mulvey's motion to rehear and vacate the adoption order and lifted the stay tolling it. This appeal followed in which Mulvey contends the trial court erred 1) "by denying [her] a neutral and impartial arbiter [and] . . . becoming an advocate," 2) "in terminating the parent-child relationship and granting the petition for adoption by the stepmother, as the evidence and factors set forth in Code § 63.2-1205 did not support this decision," and 3) "by terminating the parent-child relationship and by granting the petition for adoption by the stepmother, when the evidence . . . did not support a finding that the mother was unfit, as required under the Fourteenth Amendment to the U.S. Constitution . . . ."

ANALYSIS

I. Standard of review

In asserting that the trial court's decision to terminate her parental rights violated her liberty interests protected by the Due Process Clause of the Fourteenth Amendment, Mulvey raises a constitutional challenge subject to *de novo* review in this Court. *Warnick v. Commonwealth*, 72

- 16 -

Va. App. 251, 263 (2020). In conducting that review, however, we recognize that the trial court heard evidence *ore tenus*, and thus, its factual findings are "entitled to the same weight accorded a jury verdict, and [they] will not be disturbed on appeal unless plainly wrong or without evidence to support" them. *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44 (2014). Furthermore, "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Harvey v. Flockhart*, 65 Va. App. 131, 146 (2015) (quoting *Sandoval v. Commonwealth*, 20 Va. App. 133, 138 (1995)). Accordingly, we view the evidence in the light most favorable to appellees and grant them all reasonable inferences that flow from that view, *id.* at 145, unless the trial court has made a specific finding or specifically rejected such a potential inference. In such cases, we are bound by the trial court's specific findings and rejection of specific inferences unless the record compels a contrary conclusion. *Frouz v. Commonwealth*, 296 Va. 391, 399 (2018).

## II. Special status of the parent-child relationship

The most natural of relationships, the relationship between parent and child has long been granted special solicitude by American courts. The United States Supreme Court has recognized that "[t]he rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and [are] (r)ights far more precious . . . than property rights[.]" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (ellipsis in original) (internal quotation marks and citations omitted). As a result, a mother's "'interest . . . in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by' the United States Supreme Court." *Bedell v. Price*, 70 Va. App. 497, 504-05 (2019) (second ellipsis in original) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)); *see also* Code § 1-240.1. This fundamental liberty interest, grounded in the Due Process Clause of the Fourteenth Amendment, dictates "that the custody, care and nurture of the child reside first in the parents, whose primary

function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Because the right at issue is fundamental, "state interference with that right must be justified by a compelling state interest." *Williams v. Williams*, 24 Va. App. 778, 780 (1997), *aff'd as modified*, 256 Va. 19 (1998).

Circumstances do arise where the state's interest in a child's welfare permit a court to intrude into the parent-child relationship. For example, courts frequently are called upon to resolve custody and visitation disputes between parents. Because "[c]ustody and visitation disputes between two fit parents [necessarily] involve one parent's fundamental right pitted against the other parent's fundamental right[,]" *Yopp v. Hodges*, 43 Va. App. 427, 438 (2004) (quoting *Griffin v. Griffin*, 41 Va. App. 77, 83 (2003)), courts may act because a child cannot reside in limbo and final decision-making authority regarding the care of a minor must be vested with someone.

Less frequently, a state and its courts are called upon to intervene when the parent-child relationship is so toxic that termination of the relationship is necessary to protect the child. Such "circumstances are rare," *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 320 (2013) (quoting *Lowe v. Dep't of Pub. Welfare*, 231 Va. 277, 280 (1986)), with termination of the relationship being "a grave, drastic, and irreversible action[,]" *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34-35 (2007) (quoting *Lowe*, 231 Va. at 280). After a termination, "the parent is divested of all legal relations to the child, and the parent has no legal right to even communicate or visit th[e] child[,]" *id*. at 34, leaving "the parent . . . a legal stranger to the child[,]" *id*. at 35 (internal quotation marks omitted). As a result, any party seeking to have the state terminate a parent-child relationship is faced with a heavy burden.

A party, whether an individual or the state, seeking to terminate the relationship between a parent and child must make several showings by clear and convincing evidence. *Santosky v.*

*Kramer,* 455 U.S. 745, 769 (1982). As a threshold matter, the party seeking termination must establish that termination serves the best interests of the child; however, "the Constitution requires more than a showing of the best interests of the child to terminate parental rights." *Copeland*, 282 Va. at 198. To survive constitutional scrutiny, termination also requires clear and convincing evidence of parental unfitness, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), and that continuing the parent-child relationship constitutes a "detriment to the child[,]" *Copeland*, 282 Va. at 183; *see also Frye v. Spotte*, 4 Va. App. 530, 532 (1987).

### III. Adoption petitions under the Virginia statutory scheme

An order of adoption "severs the parent-child relationship between" a parent and the child. *Bedell*, 70 Va. App. at 506 n.6. In cases involving adoption by a stepparent, the preexisting parental rights and obligations of anyone other than the spouse of the stepparent are automatically terminated by the final order of adoption. *See* Code § 63.2-1215.[3]

Recognizing the special solicitude owed the parent-child relationship, Code § 63.2-1202 provides that "[n]o petition for adoption shall be granted, except as hereinafter provided in this section, unless written consent [of the birth parents] to the proposed adoption is filed with the petition." Nevertheless, an adoption may be granted over the objection of a birth parent when the trial court finds "after consideration of the evidence" that the objecting parent's consent is being withheld contrary to the best interests of the child "as set forth in § 63.2-1205." Code § 63.2-1203. Pursuant to Code § 63.2-1205, the trial court,

> [i]n determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, . . . *shall consider all relevant factors*, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child; whether the birth parent(s) are currently willing and able to assume full custody of the child; whether the birth parent(s)' efforts to assert parental rights were thwarted by other people; the birth

---

[3] Thus, the proposed adoption would not result in the termination of Rhoads' parental rights, but would result in the termination of Mulvey's parental rights.

parent(s)' ability to care for the child; the age of the child; the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children; the duration and suitability of the child's present custodial environment; and the effect of a change of physical custody on the child.

(Emphasis added). With its command that a trial court consider "all relevant factors" and its list of often overlapping factors requiring a trial court to focus both on the child and the parent, Code § 63.2-1205's overriding purpose is to ensure that an adoption over the objection of a biological parent serves both the best interests of the child and respects the constitutional rights of the parent.

### IV. Application to the adoption petition in this case

In seeking an order permitting MacNally to adopt T.M., Rhoads and MacNally necessarily sought an order terminating Mulvey's parental rights. Mulvey's objection to the adoption petition implicated the constitutional and statutory requirements detailed above.

The parties agree that, in the trial court, Rhoads and MacNally bore the burden of establishing by clear and convincing evidence that Mulvey was an unfit parent, that continuing the parent-child relationship was detrimental to T.M., and that terminating Mulvey's relationship with T.M. and granting the adoption petition was in the best interests of T.M. Pertinent to this appeal, Mulvey contends that the trial court never made the necessary finding that she was unfit and argues that no such finding was warranted from the evidence. Acknowledging that the trial court never made an express finding of parental unfitness, MacNally and Rhoads contend that an implicit finding of unfitness is constitutionally sufficient, that the trial court implicitly found Mulvey to be unfit, and that the evidence was sufficient to support such a finding.

Given the fundamental nature of the relationship and rights at issue, it is beneficial for a trial court to state expressly the basis for a termination decision, detailing the necessary findings and the evidence relied upon to make those findings. Such detail provides a full explanation to

- 20 -

the affected parent of what is happening and why, and also provides a complete record for an appellate court to review.

That providing such detail and expressly setting out the necessary findings, including a finding of parental unfitness, unquestionably is the best practice does not mean, however, that it is constitutionally required. Given Virginia's statutory scheme regarding adoption and other parental rights terminations and the cases interpreting those schemes, we are bound to conclude that an express finding of unfitness is not required.

A similar question arose in *Copeland*, a case involving adoption over the objection of a birth parent. In *Copeland*, the trial court did not make an express finding that continuing the parent-child relationship would be detrimental to the child; rather, it conducted an analysis of the statutory factors detailed in Code § 63.2-1205 before terminating the birth parent's rights and allowing the adoption to proceed. In affirming the trial court's termination decision, the Supreme Court held that

> [i]nclusion of the precise language of "detriment" is not necessary
> . . . to pass constitutional muster. The phrase "detriment to the
> child" is no term of art or requisite mantra. Rather, for these
> statutes to pass constitutional due process scrutiny, they must
> provide for consideration of parental fitness and detriment to the
> child. The Virginia statutory scheme does so.

*Copeland*, 282 Va. at 199.

In the absence of an express finding of Mulvey's unfitness, MacNally and Rhoads assert that, as in *Copeland*, the evidence and the trial court's explicit consideration of the factors delineated in Code § 63.2-1205 is sufficient to imply a sufficient finding of parental unfitness to satisfy the constitutional concerns raised by Mulvey. Accordingly, we now turn to the evidence and the trial court's consideration of Code § 63.2-1205.

V.  Application of Code § 63.2-1205

We first note that the factors specifically delineated in Code § 63.2-1205 are neither exclusive nor exhaustive.  Often overlapping, the specified factors provide a baseline from which a trial court should begin its inquiry, but they do not and cannot represent the endpoint because the statute commands consideration of "*all relevant factors*[,]" Code § 63.2-1205 (emphasis added), not just those that are specifically listed.

A.  Significant non-delineated factors

Rather than begin our analysis by reviewing the trial court's findings regarding the specifically delineated factors, we start with two significant factors that do not fall neatly within the listed factors—T.M.'s mental and emotional health and how the matter came to be before the trial court.  Although neither is specifically listed in Code § 63.2-1205, each colors and informs our review of the trial court's consideration of the delineated factors and of its ultimate decision.

Although the child in question is clearly the focus of the delineated factors in Code § 63.2-1205, the listed factors do not specifically call on a trial court to make findings regarding the mental and emotional health of the child and any such challenges faced by the child.  This is not because such determinations are irrelevant to the inquiry.  To the contrary, they are critical to properly placing findings under the listed factors in an appropriate context.

We begin our review by noting that the evidence establishes that T.M. is and has been for some time in a troubled mental/emotional state.  The evidence established that, whether in the custody of Mulvey or the custody of Rhoads and MacNally, T.M. has been prone to behavior problems and emotional outbursts that are significant enough to require professional mental health intervention.  The trial court, crediting some of the expert testimony before it, reasonably concluded from the evidence that T.M. is in a fragile state and that any additional trauma could have significant negative consequences to her well-being.

- 22 -

The trial court accepted the expert testimony that established the seriousness and precariousness of T.M.'s mental and emotional state; however, the trial court did not accept the expert theories as to the precise cause of those problems. In both its initial ruling and at the motion to rehear, the trial court reiterated that it had considered the evidence regarding potential causes of T.M.'s fragile emotional state and had entertained various theories as to its cause but had been unable to reach a definitive conclusion regarding the underlying cause. At one point, the trial court explained that it had "wondered when [it] started this case if [it] needed to figure out the why on" T.M.'s mental fragility and that it "would have liked to have an answer to that," but other than "com[ing] up with a few theories based on the evidence," the trial court stated it "ha[d] no solid answers" as to the underlying cause of T.M.'s mental and emotional problems.

The trial court's expressly disclaiming any conclusion regarding causation is significant. Just as we are bound by the trial court's finding that T.M.'s mental and emotional stability is precarious, we are bound by its conclusion that the evidence did not establish the underlying cause of the problem. Even if evidence exists that would allow an inference as to the cause, we may not draw such an inference because it would be inconsistent with the express findings of the trial court. Accordingly, Rhoads and MacNally, the parties bearing the burden of proof, failed to establish that any act or omission of Mulvey has caused the child's precarious emotional state.

Another significant non-delineated factor that informs our review is *how* the matter came before the trial court. Unlike many cases involving adoptions requiring involuntary termination of parental rights, this matter did not arise out of founded findings of abuse and neglect or a situation where social services needed to remove a child from a biological parent to the safety of a foster family; rather, it stems from a series of contentious custody and visitation proceedings initiated and litigated by T.M.'s biological parents.

- 23 -

As a result, there were no underlying findings of parental unfitness in any of the prior custody decisions. Although those proceedings, whether in West Virginia or Virginia, involved determining what would serve T.M.'s best interests, the best interests examination was conducted within the context of a custody dispute between parents and did not involve the "much more demanding" examination of best interests required in adoption proceedings that result in termination of parental rights. *Copeland*, 282 Va. at 197. Thus, while the trial court was free to consider the underlying factual findings in the other proceedings, none of those proceedings resulted in a finding, express or implied, of parental unfitness.[4]

To its credit, the trial court recognized that the lack of a prior finding of abuse or parental unfitness should affect its review of delineated Code § 63.2-1205 factors. Specifically, the trial court noted that the case "would [have] be[en] so much easier" if there had been evidence of "Mulvey just seriously beating this child" or that there had been "a founded CPS allegation[.]"[5] Similarly, in both the trial court and at oral argument in this Court, MacNally and Rhoads conceded that the lack of such a prior finding or related issue potentially distinguished the case from *Copeland*, noting that none of the prior adoption cases fit this particular fact pattern and acknowledging that this "could very possibly be a case of first impression."

---

[4] With credible candor, Rhoads and MacNally conceded during oral argument in this Court that the West Virginia order relied upon by the trial court contained no express finding of unfitness.

[5] The trial court's reference to potential physical abuse of T.M. by Mulvey was not a *non sequitur* because the record contains suggestions of potential abuse, but no direct evidence. For example, father filed numerous abuse complaints against Mulvey with CPS, but all were determined to be unfounded. Furthermore, Haydash testified that T.M. told her of instances of physical punishment/abuse, but Haydash did not witness any such events and did not make any reports to the appropriate authorities regarding concerns of abuse.

## B. Delineated factors

### 1. Efforts to obtain or maintain legal and physical custody of the child

The first of the factors specifically set out in Code § 63.2-1205 deals with Mulvey's "efforts to obtain or maintain legal and physical custody of the child[.]" Here, the fact that the matter arose out of a series of custody cases between biological parents rather than after a CPS removal is significant. The record makes clear that the parties had engaged in extensive custody proceedings in multiple states over multiple years. There is little doubt that Mulvey wanted physical and legal custody of T.M. with the trial court specifically stating that if "Mulvey thought that there was any chance whatsoever that [the trial court] would just switch custody over [to Mulvey], that's what she would be asking for. I don't have any doubt on that."

Although the record demonstrates that Mulvey engaged in efforts to obtain and maintain custody of T.M., those efforts were far from perfect. As the trial court noted, Mulvey did not always comply with trial court orders in West Virginia regarding T.M. and those failures were part of the reason Rhoads was granted custody. Furthermore, the evidence supports a conclusion that Mulvey, by her own conduct, caused a loss of visitation at various points in time. However, these failings by Mulvey, although certainly relevant to determining who should have custody of T.M., by themselves do not support a conclusion that Mulvey was unfit.

Rhoads and MacNally raise the fact that Mulvey has filed no current petition seeking to regain custody of T.M. Although the lack of such a petition has great salience in a case where a child has been removed to a foster home that is viewed as a potential permanent placement, it is less significant when custody has been awarded to the other biological parent. To hold otherwise essentially would require a parent on the losing end of a custody dispute to continually file new petitions seeking to reverse that outcome lest he or she be deemed to have demonstrated a lack of "effort[] to obtain or maintain legal and physical custody of the child" and thereby risk a potential

termination of parental rights under Code § 63.2-1205. Simply put, given that it is clear to all that Mulvey desired custody of T.M., the fact that, in the full context of this case, no current petition seeking that outcome had been filed does not suggest in any way parental unfitness.

2. Whether Mulvey was currently willing and able to assume full custody

Related to the first, the second delineated factor in Code § 63.2-1205 is whether the birth parent is "currently willing and able to assume full custody of the child[.]" As noted above, the trial court here specifically found that Mulvey was willing to assume custody of T.M. The trial court then turned to whether she had the ability.

First, the trial court addressed whether Mulvey had sufficient financial and other resources to provide for T.M.'s material needs. Although questions had been raised about that, the trial court concluded that Mulvey had sufficient resources to do so. The trial court then noted that ability to assume full custody "means a lot more than just that though."

Based on the evidence, the trial court concluded that while Mulvey would be able to address T.M.'s physical needs, she was unsuited and unable to deal with T.M.'s emotional needs. As explained by the trial court, it concluded from the evidence that Mulvey had irrational fears of being followed and stalked that she effectively was passing on to T.M. Thus, when in Mulvey's custody, T.M. felt anything but safe, which the trial court concluded was "the most important thing to a child." As sufficient evidence supports the trial court's conclusion in this regard, the trial court's conclusion that Mulvey is not able to address T.M.'s emotional needs to assume full custody binds us on appeal.

This finding certainly raises questions about Mulvey's parental fitness. Obviously, one aspect of being a fit parent is attending to all of a child's needs—financial, physical, and emotional. Although not every such failure renders a parent sufficiently unfit to allow for

- 26 -

termination of parental rights, the trial court's finding in this regard plays a role in the overall analysis.

### 3. Whether Mulvey's efforts to assert parental rights were thwarted by other people

The trial court reasonably concluded that no other person was seeking to thwart Mulvey's assertion of parental rights. Although, as with any custody battle between biological parents, the resulting orders obtained by Rhoads regarding custody and visitation restricted Mulvey's ability to assert parental rights, the orders are relatively routine custody orders. Given the inability of Mulvey and Rhoads to coparent T.M., the courts had to make decisions regarding physical and legal custody that, by definition, restrict the ability of the non-custodial parent to assert parental rights at specified times and places. Contrary to Mulvey's assertion, such routine custody orders simply do not amount to a "thwarting" of parental rights for the purposes of Code § 63.2-1205.

Of course, the fact that the relatively normal custody orders entered here do not "thwart" Mulvey's assertion of her parental rights underscores that they tell us little about parental fitness. The underlying custody orders, entered in proceedings that did not require findings of unfitness, provide little to no basis to conclude that Mulvey was sufficiently unfit to allow termination of her constitutionally protected parental rights.

### 4. Mulvey's ability to care for the child

The next delineated factor, the ability of Mulvey to care for T.M., obviously is related to the trial court's review of Mulvey's ability to assume full custody. In its analysis of whether Mulvey was able to assume custody, the trial court specifically addressed Mulvey's ability to care for T.M. As noted above, the trial court reasonably concluded that Mulvey could provide for T.M.'s material and physical needs but was unable to provide the emotional support that T.M. requires at present. These findings were supported by evidence, and thus, bind us on appeal.

### 5.  T.M.'s age

The trial court noted that, at the time of its initial ruling in October 2020, T.M. was nearly twelve and a half years old and that certain aspects of stepparent adoption change when the child reaches fourteen years of age.  *See* Code § 63.2-1241(B)(vii).  The trial court went on to note that it gave the factor little to no weight.  Given the issue on appeal, we find that T.M. being just over twelve years of age shed no light on whether or not Mulvey was an unfit parent and certainly provides no basis for an express or implied finding that Mulvey was sufficiently unfit to permit termination of her parental rights.

### 6.  The quality of any previous relationship between Mulvey and T.M.[6]

In addressing the prior relationship between Mulvey and T.M., the trial court recognized that there were positives to that relationship.  The trial court specifically found that the two "had [experienced] decent time periods" with each other and that "they had fun together at times."  Such a finding was supported by the evidence; however, the trial court found it was offset by the negatives it perceived in the relationship.  As noted, the trial court commented on what it determined were Mulvey's irrational fears that she was projecting onto T.M.; but it further emphasized that it had been unable to determine an exact cause of T.M.'s mental state, noting that it "would have liked to have an answer to that" and that it had entertained "a few theories based on the evidence, but" had been unable to arrive at "solid answers."  As we have explained, we are bound by both the trial court's conclusion that T.M. feels unsafe while with Mulvey and its conclusion that the evidence does not explain why.

---

[6] The entire factor also requires a trial court to analyze a birth parent's relationship with "any other minor children[.]"  Code § 63.2-1205.  Here, there was no evidence of Mulvey being the birth parent to "other minor children[,]" and the trial court appropriately determined that portion of the factor to be "irrelevant" in this case.

7.  The duration and suitability of T.M.'s present custodial environment

The evidence established the length of time T.M. had been in the custody of her father and MacNally and the suitability of that arrangement. The trial court recognized that there had been issues, but reasonably determined that the present custodial relationship was in the best interests of T.M. In short, from the evidence, the trial court reasonably concluded that, of the potential custodial arrangements, T.M.'s present situation was the best option.

Again, it is important to recognize that, to the extent that previous litigation considered varying custodial arrangements, the choices all dealt with arrangements involving the two biological parents to one degree or another. This was not a case in which the choices were between a foster family and a biological parent. Although a trial court's conclusion that a foster family may provide a more suitable environment for a child does imply at least some level of parental unfitness, no such implication arises from a trial court's conclusion that one biological parent is a more suitable custodian than the other biological parent. To hold otherwise would raise the specter of parental unfitness in every case in which one biological parent is granted custody over the other biological parent. That has never been the case and certainly cannot be squared with a proper respect for the non-custodial parent's constitutionally protected parental rights.

8.  The effect of a change of physical custody on T.M.

Having concluded that T.M. being in the custody of her father and MacNally was the most suitable arrangement for T.M., the trial court also concluded that a change in that arrangement would be detrimental to T.M. Such a finding is fully supported by the evidence; however, once again, the context of the case greatly diminishes the finding's effect on the question of Mulvey's fitness.

In cases in which the dispute is between a biological parent seeking to regain custody and a foster family that is seeking to make the custodial arrangement permanent by way of adoption,

- 29 -

whether to leave the existing custody arrangement in place is a central question to be resolved. To grant the adoption is to make the arrangement permanent; to grant the relief requested by the biological parent is to reject making the arrangement permanent and ultimately requires changing the arrangement.

No such question needed to be answered here. As the trial court noted in discussing this factor, neither Mulvey nor anyone else was "asking for a change in physical custody[.]" Regardless of how the trial court ruled on the adoption petition, T.M. was to remain in the custody of her father and MacNally. Again, because this case arose out of custody disputes between biological parents, the fact that the trial court found that T.M. was best served by remaining in Rhoads' custody does not, without more, imply anything about Mulvey's fitness as a parent. To hold otherwise is akin to suggesting that all non-custodial parents may be unfit, which simply is not the case.

### C. Totality of all of the factors

Although we have detailed and reviewed the trial court's specific findings for each of the factors above, it is important to recognize that Code § 63.2-1205 requires that the factors not be viewed in isolation. Both the statutory scheme and the constitutional protections at issue require consideration of all of the relevant factors in concert with one another. Only when all of these factors are viewed together can a determination be made whether the necessary showings have been made.

In this appeal, we consider whether the trial court's factual findings form a sufficient basis upon which to infer a level of parental unfitness that warrant Mulvey being stripped of her constitutionally protected interest in maintaining a legal relationship with her daughter. On this record, we conclude that the evidence is insufficient to support such an implicit finding of unfitness.

In doing so, we fully credit the trial court's conclusions that T.M. is in a precarious emotional and mental state, that custody and even visitation with Mulvey exacerbates those problems, that further problems could have severe long-term consequences for T.M., and that her best interests in both the short and the long term are best served by the current custody arrangement. If we were being asked to review a ruling relating to a routine "custody dispute[] between natural parents[,]" *Copeland*, 282 Va. at 197, we would affirm without hesitation. We, however, are not presented with such a routine case, but rather, are faced with a termination/adoption case that fully implicates Mulvey's "due process rights in her relationship to her child[,]" and thus, is "much more demanding." *Id.*

To satisfy the more demanding standard, the trial court was required to find that Mulvey was unfit as a parent. The trial court declined to make such an express finding despite the request of all parties that it expressly rule on the question.[7] We are therefore left to determine whether the findings the trial court did make are sufficient to support an implicit finding of the requisite level of unfitness.

Despite all of the testimony regarding the problems faced by T.M. and potential causes of those problems, the trial court specifically found that it could not identify the genesis of T.M.'s mental and emotional problems.[8] Given that specific finding of the trial court, we may not infer from the evidence that such a cause could be or was otherwise established. The trial court's effective rejection of such a causal link precludes the conclusion that a sufficient level of

---

[7] Although we conclude that the trial court was not required to make the finding expressly, the refusal of the trial court to do so in light of the requests of the parties colors our analysis of whether the record supports an implicit finding.

[8] We in no way criticize the trial court for its failure to identify a cause. The record is complex and, other than the fact that T.M. has mental health issues, very little about those issues is clear or definitive. The trial court's decision not to determine a cause represents a recognition that the issue is uncertain. Given the conceded requirement that Rhoads and MacNally establish Mulvey's unfitness by clear and convincing evidence, such uncertainty is fatal to their claim.

parental unfitness by Mulvey was the cause. Absent such a causal link, the record, taken as a whole, does not support an implicit finding of parental unfitness sufficient to permanently sever the parent-child relationship. Accordingly, the judgment of the trial court regarding the adoption petition and the associated name change request is hereby reversed.[9]

CONCLUSION

One of the most difficult questions any court ever faces is whether to terminate forever a parent-child relationship. As noted above, such an action is "grave, drastic, and irreversible[,]" *Haugen*, 274 Va. at 34-35 (quoting *Lowe*, 231 Va. at 280), and thus, only arises when there are legitimate reasons to believe that continuing the relationship poses a significant risk of harm to the child. That certainly is the case here, as the evidence established that T.M.'s situation is precarious. Nothing in our holding should be read to suggest otherwise or to imply that the concerns raised by Rhoads, MacNally, and even the trial court were anything other than legitimate worries motivated by nothing other than a desire to do what was best for T.M.[10]

Such concerns, however, must be balanced against a parent's constitutionally protected interest in maintaining the parent-child relationship. Based on all of the findings of the trial court viewed through the appropriate lens, the record fails to establish a sufficient level of

_____

[9] Because our resolution of the parental fitness issue disposes of the appeal, we do not reach the other arguments raised by Mulvey. *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) ("The doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available." (internal quotation marks and citations omitted)).

[10] Mulvey has requested an award of attorney fees incurred on appeal. Given our conclusion that all parties have acted in what they believe are the best interests of T.M. and considering all of the equities of the case, we decline to award the requested attorney fees.

parental unfitness by Mulvey to justify permanently terminating her relationship with her child.

Accordingly, the judgment of the trial court is reversed.[11]

*Reversed.*

---

[11] Although we reverse the trial court's judgment regarding the termination of Mulvey's parental rights, no part of our decision should be viewed as addressing any custody and visitation issues that may arise given our resolution of the appeal. Our conclusion that the record was insufficient to terminate Mulvey's parental rights does not address, in any way, whether modifying custody or allowing Mulvey visitation with T.M. at present is appropriate. Such questions are not before us in this appeal.